THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MARK MAXSON, Defendant-Appellant.

First District (5th Division) No. 1—94—1586

Opinion filed November 27, 1996.—Rehearing denied December 30, 1996.

Michael J. Pelletier and Anna Ahronheim, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, James E. Fitzgerald, and William L. Toffenetti, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE McNULTY delivered the opinion of the court:

After a jury trial, defendant Mark Maxson was found guilty of first degree murder and aggravated criminal sexual assault. Defendant was sentenced to natural life for the first degree murder and an extended term of 50 years for the aggravated criminal sexual assault, the sentences to run concurrently. Defendant claims on appeal that: (1) the trial court erred in denying defendant's motion to quash arrest and suppress statements; (2) defendant was denied effective assistance of counsel where his attorney failed to file a motion *in limine* to bar impeachment use of defendant's prior conviction for rape; (3) the trial court improperly conducted its own investigation into the destruction of the crime scene; (4) the prosecutor improperly commented in closing argument that defendant's conduct fit the pattern of a child molester; and (5) the trial court erred in sentencing defendant to an extended term for aggravated criminal sexual assault where that offense was not the most serious offense with which defendant had been charged. We affirm in part, vacate in part and remand in part.

Prior to trial, a hearing was held on defendant's motion to quash arrest and suppress statements. Detective Pesavento testified at the hearing that on August 30, 1992, at about 5 p.m., he and his partner were called to an abandoned garage at 10730 South State Street and observed the body of six-year-old Lindsey Murdock. Lindsey's body was naked and bloody and had obvious injury to the back of the head. At about 9 p.m. that evening, Detective Pesavento learned that a man being interviewed on the television news was giving information·on Lindsey's whereabouts the night of his death. Detective Pe-

savento located this man, whom the detective identified as defendant, in a lot near the garage where the body was found. The detective asked defendant if he had information that could help them in their investigation. Defendant was very cooperative. He told the detectives that he had met Lindsey the previous night near 111th and Michigan, had a conversation with him, bought him some potato chips, and then walked him part of the way home. He did not see Lindsey after that.

Detective Pesavento asked defendant if he would come to the station to give a statement. Defendant was willing and cooperative. The detective then drove defendant to Area Two headquarters.

Detective Pesavento placed defendant in a small office and, at about 10 p.m., had a conversation with him in which defendant gave a more detailed account of what happened, including names of people he saw after leaving Lindsey. This interview lasted about an hour or an hour and a half. Detective Pesavento did not inform defendant that he was free to leave. The detective asked defendant whether he would be willing to stay at the station while he attempted to confirm his story. Detective Pesavento also asked defendant whether he would take a lie detector test, and defendant agreed. Defendant said that he was willing to help out in any way he could. Detective Pesavento was unable to schedule a lie detector test for that evening. The detective was also unable to contact any of the people defendant claimed to have seen after leaving Lindsey. Defendant spent the night in the interview room, which did not have either a bed or a cot.

Detective Duffy next testified that on August 31, 1992, at 9:30 a.m., he and his partner, Detective Dwyer, interviewed defendant. They found him in an interview room, with the door closed, but not locked. The room was located on the second floor in a completely secured area.

Detective Duffy advised defendant of his *Miranda* warnings. During the half-hour interview, defendant told the detectives that he saw Lindsey, they walked a short distance, they went to a liquor store and then parted. Defendant did not know what happened to Lindsey after that. At the conclusion of this conversation, Detective Duffy did not tell defendant that he could go home but instead obtained defendant's consent to take a lie detector test. Defendant was then allowed to make three phone calls to family members. Detectives Duffy and Dwyer then took defendant to 1121 South State Street. They arrived there at 11:30 a.m. Defendant was not handcuffed during the ride. When the lie detector test was completed, Robert Tovar, the technician who administered the test, informed defendant and the detectives that, in his opinion, defendant had not answered the

questions truthfully. Detective Duffy did not offer to take defendant home but, instead, drove him back to Area Two. Defendant was not handcuffed during the drive.

At about 3:45 p.m., Detective Duffy asked defendant if he would agree to have blood drawn for a test, as well as give samples of head and pubic hair and saliva. Defendant agreed. Detective Duffy explained to defendant that blood and hair samples had been found at the scene. According to Detective Duffy, defendant never asked to leave the station and agreed to stay until the next day to give the samples. While the detectives were telephoning hospitals to arrange for the blood test, they gave defendant something to eat and drink.

Defendant was taken to Roseland Hospital, where his blood was drawn at 6:40 p.m. Detective Duffy testified that he did not offer to take defendant home and defendant did not ask to go home. Defendant was instead taken back to Area Two and placed in the same interview room. The door to the room was closed but unlocked. Detective Duffy claimed that defendant agreed to spend a second night at the station.

The next morning, September 1, 1992, an evidence technician took head hair, pubic hair and saliva samples from defendant. Detective Duffy and his partner interviewed defendant at 1:45 p.m., for half an hour. After that conversation, defendant was not told he was free to leave.

The detectives interviewed defendant again at about 6 p.m. During this 30- to 45-minute conversation, defendant said that he was present in the garage and that he saw Lindsey's body, covered up with a window frame. Defendant told the detectives that he needed time to think. The detectives did not tell defendant that he was free to leave and defendant did not ask to go home. Defendant told the detectives that he would stay as long as needed to help solve the crime. Detective Duffy stated that defendant was not abused or threatened in any way.

At about 10 p.m., defendant requested to speak with Detective Pesavento and his partner. Detective Pesavento testified that when he went to the interview room, the door was probably locked. The detectives gave defendant his *Miranda* warnings. During this two-hour interview, defendant implicated himself in the crime. Defendant was formally arrested at 10 p.m. Assistant State's Attorney Carlos Weeden arrived at Area Two at 2:10 a.m., and at about 8:30 a.m., a court-reported statement was taken.

Defendant testified at the suppression hearing that he went to the police station voluntarily and was assured by Detective Pesavento that he would not be there long. He was taken to the second

floor of the station and placed in a small windowless room, which had in it two chairs and a long metal bench. After being questioned by Detective Pesavento for a half an hour, the detective did not tell him he was free to leave. Rather, the detective left the room and locked the door, leaving defendant alone in the room. Defendant testified that when he needed to use the washroom, he had to bang on the door and someone came, took him to the washroom, and then returned him to the interview room.

Defendant testified that when Detective Pesavento returned, they had another conversation, during which defendant asked if he could leave and why he was being questioned this way. Detective Pesavento told him that he appeared to be a suspect. The detective then left the room, again locking the door. Defendant was left alone in the room for a long time.

When Detective Pesavento returned, defendant asked him whether he was free to leave, and the detective asked him if he would be willing to stay around for further questioning. Detective Pesavento told defendant that he was a suspect and asked whether he would be willing to take a lie detector test. Defendant agreed to take the test. He was then left alone in the locked room.

Detectives Duffy and Dwyer later appeared and asked defendant questions about August 29. Defendant signed a consent form to take the polygraph test but claimed that he did so only because he felt that he had no choice but to take the test. Defendant stated that Detective Pesavento had told him he could not leave the station until he took the lie detector test. After signing the consent form, the detectives allowed defendant to make telephone calls and he called his sister Jackie and then his mother.

Defendant was then taken to 11th and State. Defendant was given another consent form to sign and defendant signed the form since he felt that he had no choice, because if he refused, the detectives would think that he was not telling the truth. After taking the lie detector test, defendant was told that he had failed the test. The detectives then told defendant that he had to go with them and, once outside, the detectives told defendant not to try to run. Defendant was brought back to the same interview room at Area Two. The door to the room was closed but not locked.

After about half an hour, Detectives Dwyer and Duffy entered the room. They questioned defendant for about 15 minutes, during which time Detective Dwyer acted hostile and kept asking defendant why he did not just admit to committing the crime. Defendant asked if he could talk to Detective Duffy alone, and Detective Dwyer left the room. Detective Duffy told defendant that he could help himself

out by giving a blood sample. Defendant said that he wanted to leave the station or make a phone call, but Detective Duffy told him that he could do neither of these and again urged defendant to take a blood test. Defendant agreed to give the blood sample. Detective Duffy then locked defendant in the room until Duffy returned with a consent form. After defendant signed the consent form, he was taken to Roseland Hospital. Detective Duffy entered the hospital, leaving defendant in the car with Detective Dwyer. Detective Dwyer told defendant not to try to leave the car.

After defendant's blood was drawn, defendant was taken back to Area Two and placed in the same interview room. Detective Dwyer told defendant that he could neither leave nor make a telephone call. The detectives asked defendant more questions about August 29 and about Lindsey. The detectives then left defendant alone in the locked room. An officer brought defendant something to eat, but when defendant asked whether he could buy his own food with his own money, his request was denied.

Defendant testified that when Detectives Duffy and Dwyer returned, they again denied defendant's request to leave or to call his employer. The detectives questioned defendant for another 30 minutes. They then left defendant alone in the room, and when they returned, they told defendant that he might as well confess. Detective Dwyer told defendant that he could only leave the station if he stayed until the next day and gave pubic hair samples. Defendant agreed to give the samples because he did not feel that he had any choice. The detectives then asked defendant questions for another 30 minutes. Detective Duffy then became upset and told defendant that, if he did not cooperate, they would beat him. The detectives then left him alone again in the locked room.

Defendant testified that he slept on the metal bench until he was awakened by Detective Pesavento for more questioning. He was again left alone in the room until Detectives Dwyer and Duffy returned and told him that the information he had given them was not adding up to be true. The detectives told defendant that he had to stay at the police station.

After hair samples were taken, defendant was again left alone in the room. When the detectives returned, they asked defendant whether he had an alibi, and while defendant was answering, Detective Dwyer slapped him in the face. The detectives again left defendant alone in the locked room. When they returned, they told defendant certain information that he did not know. Defendant then asked for an attorney, but his request was denied. During the next few hours, defendant was questioned by different detectives and left alone

in the room and then questioned and left alone again. When Detective Dwyer returned, he told defendant that he was not being cooperative, kicked defendant in the ribs, and again left defendant alone in the room. Defendant pounded on the door until someone came to take him to the bathroom.

Defendant testified that Detective Pesavento then returned and told defendant that he might as well talk to him because none of the other officers wanted to talk to him or could get him to confess to the killing. Defendant asked him how he could confess to something he did not do. Defendant then talked with Detective Pesavento for about an hour and then spoke with Assistant State's Attorney Weeden. Defendant claimed that he was never told that he was under arrest. Defendant testified that nobody ever told him he could leave Area Two and he did not believe that he could leave. He never agreed to spend the night at the station or remain there for two days.

Defendant's brother John and his sister Jacqueline both testified that, after learning that defendant was at the station, they went to the station, but their requests to see defendant were denied.

The trial court denied defendant's motion to suppress, on the basis that defendant voluntarily accompanied the detectives to the police station and voluntarily remained there for two days in order to help the detectives in their investigation.

At trial, Joyce Beard testified that she was working at Fortenberry's liquor store and lounge on August 9, 1992, when she saw defendant and a boy enter the store. Defendant bought some liquor and a bag of potato chips.

Dr. Mitra Kalelkar testified that she performed the autopsy on Lindsey Murdock, Jr. She testified to the numerous injuries to Lindsey and concluded that the cause of death was multiple blunt force and sharp force injuries, as well as strangulation.

Serologist Therese Ann Finn testified that she examined blood found on a mirror recovered from the scene and determined that it belonged to Lindsey. Lindsey's shirt, which was found in the garage, had bloodstains on it that matched Lindsey's blood. The shirt also had bloodstains that were inconsistent with either Lindsey's or defendant's blood. Blood on Lindsey's hand did not match that of either Lindsey or the defendant. There was blood on defendant's clothing, but Finn could not determine whether it was human blood. Finn could not determine the age of any of the blood stains.

A video tape of defendant's conversation with the news reporter on August 30, 1992, was played to the jury. In that interview, defendant told the reporter that, at about 10:30 p.m. the previous night, he saw Lindsey walking down the street and asked him why he was out

so late. Lindsey seemed distressed, and Lindsey told defendant that his parents had been arguing. Defendant bought Lindsey some potato chips and told him that he should go home.

Defendant's court-reported statement was also introduced into evidence. In that statement, defendant stated that in the evening of August 9, 1992, he purchased a bag of cocaine and was walking to a friend's house when he saw a boy who appeared to be about eight years old. Defendant told the boy that it was late for him to be outside. The boy asked if defendant had any change so that he could buy a bag of chips. Defendant went to the Fortenberry's Liquor Store on 111th Street and bought the boy some chips. They then left the store and walked toward State Street. The boy told defendant that he was having problems at home and was running away. Defendant told him that the best thing he could do was go home and face his parents. The boy said okay and went north on State Street. Defendant did not go to his friend's house but instead entered an abandoned garage and smoked his cocaine. A figure then appeared in front of him and startled him. He reached down and grabbed the figure and spun him around and saw that it was the little boy for whom he had bought the chips. Defendant asked the boy to suck his penis, and the boy refused. Defendant told the boy that he could not leave until he did. He then told the boy to take his clothes off, and the boy took off his shirt. Defendant placed his penis in the boy's mouth. Defendant told the boy that he was not doing it right and then hit the boy in the face once or twice. The boy fell to the ground. Defendant told the boy that he could do better than that. The boy got up slowly, and defendant put his hands around the boy's shoulder. After sucking defendant's penis for three or four minutes, the boy gasped and fainted. Defendant then had anal sex with the boy. Defendant then moved the boy's body to the side of the garage and poked him with a stick and some glass and realized that the boy was dead. He then hid the body under a window frame and left the garage.

Criminalist Robert Berk testified that he analyzed head and pubic hair samples taken from Lindsey's clothing and found that they did not match the characteristics of either defendant's or Lindsey's hair.

The jury found defendant guilty of first degree murder and aggravated criminal sexual assault. Defendant was sentenced to natural life for the first degree murder and an extended term of 50 years for the aggravated criminal sexual assault.

██ ██Defendant first claims that the trial court erred in denying his motion to quash his arrest and suppress his statement. In determining whether an arrest has occurred, the court must consider whether a reasonable person, innocent of any crime, would have

believed that he was arrested or free to leave. *Michigan v. Chesternut*, 486 U.S. 567, 100 L. Ed. 2d 565, 108 S. Ct. 1975 (1988); *People v. Neal*, 111 Ill. 2d 180, 489 N.E.2d 845 (1985). The factors to consider in making this determination include: (1) the time, place, length, mood, and mode of the interrogation; (2) the number of police officers present; (3) any indicia of formal arrest or evidence of restraint; (4) the intention of the officers; (5) the extent of the officers' knowledge; (6) the focus of the officers' investigation; (7) the subjective belief of the detainee concerning his arrest status; (8) any statement or nonverbal conduct of the police indicating that the detainee was not free to leave; and (9) whether the detainee was told he was free to leave or that he was under arrest. *People v. Reynolds*, 257 Ill. App. 3d 792, 629 N.E.2d 559 (1994). An appellate court will not disturb the ruling of the trial court on a motion to quash arrest and suppress evidence unless the decision is against the manifest weight of the evidence. *People v. Holloway*, 86 Ill. 2d 78, 426 N.E.2d 871 (1981). In reviewing a motion to quash arrest, this court must consider as true the testimony of the detectives, except where the defendant's testimony is unrebutted, so as to not substitute our judgment for that of the trial court on issues of credibility. *People v. Young*, 206 Ill. App. 3d 789, 564 N.E.2d 1254 (1990).

Defendant's encounter with detectives began after defendant stated in a television interview that he had seen the boy just prior to his murder. Because defendant was the last person to have seen the boy alive, he had information that could help the detectives in their investigation. Defendant spoke with the detectives briefly on August 30 near the scene of the crime, and it is undisputed that defendant went to the police station voluntarily in order to provide the police with a more detailed account of his encounter with the boy.

■ Our review of the record also reveals that the trial court's determination that defendant voluntarily chose to remain at the station for the next two days was not against the manifest weight of the evidence. The length of an interrogation alone is not determinative of whether a defendant was illegally detained at the police station. See *People v. Perez*, 225 Ill. App. 3d 54, 587 N.E.2d 501 (1992) (the defendant voluntarily remained at the police station for 48 hours as a cooperating witness); *People v. Mason*, 274 Ill. App. 3d 715, 653 N.E.2d 1371 (1995) (the defendant voluntarily remained at the station for 48 hours in order to obtain protection from the police until the people he had implicated in the crime were taken into custody).

Because the detectives were concerned that defendant was just seeking publicity when he claimed to have seen the boy, they asked him if he would remain at the station while they attempted to

confirm his story. Defendant agreed. The detectives also asked defendant if he would be willing to take a lie detector test. Detective Pesavento told defendant that he had a right to refuse to take the test. Defendant was very cooperative and said that it was a terrible thing that had happened to the boy and he wanted to help in any way he could.

The detectives were unable to contact any of the people defendant claimed to have been with the night of the murder and were unable to schedule a lie detector test that evening. Defendant agreed to take the test the next morning and he spent the night in the interview room.

The morning of August 31, defendant was informed of his *Miranda* rights and again agreed to take a lie detector test. Before being taken to 1121 South State to take the test, defendant was allowed to make three phone calls. Later that afternoon, the detectives asked defendant whether he would agree to have blood drawn for a test and give hair and saliva samples. Defendant agreed and signed a consent form. After having his blood drawn, defendant said that he would give the other samples "tomorrow" and said he would stay as long as the detectives needed him to find out what happened to the boy. Defendant spent another night in the unlocked interview room.

On the morning of September 1, hair samples were taken from defendant. At 6 p.m. that evening, defendant admitted to the detectives that he had been present in the garage and seen the boy's body covered up with a window frame. Defendant then told the detectives that everything would come out, but he needed some time alone to think. Defendant never asked to leave the station. Defendant told the police that he was going to remain as long as they wanted him to because he wanted to find out what happened to the boy as badly as they did.

At 10 p.m., defendant requested to speak to Detective Pesavento. Defendant told the detective not to worry, that everything would come out, but it would take time and he had to find the right avenue to bring it out. After speaking with the detective for two hours, defendant confessed. When the assistant State's Attorney who took defendant's court-reported statement asked defendant whether he had consented to have his blood drawn and to have hair samples taken, defendant responded that he had consented to clear himself.

The detectives testified that during defendant's entire stay at the station, he was calm, quiet, cooperative and willing to help the police in their investigation. Defendant kept assuring the detectives not to worry, that "it was all going to come out." Defendant told the detectives that he would stay there as long as they wanted because he was

the last person who had seen the child and he wanted to help find out who killed him.

These unique circumstances reveal that defendant voluntarily remained at the station for 44 hours before probable cause to arrest arose. When defendant stated in the television interview that he had seen the boy prior to the murder, he knew that the police would be interested in talking to him. He therefore willingly went to the station and remained there voluntarily as a cooperating witness. Defendant repeatedly stated that he wanted to help the detectives in their investigation and that he would remain at the station until the case was resolved. Defendant told the officers not to worry, that the whole story would come out and that he just needed to figure out the right avenue for it to come out. At one point, defendant even asked to be left alone because he needed time to think. Defendant signed consent forms for the lie detector test, the blood test and the giving of hair samples. The fact that he claimed to have consented only to clear himself further reveals the voluntariness of his actions. The trial court therefore properly denied defendant's motion to quash his arrest and suppress his statement.

■ Defendant next claims that he was denied effective assistance of counsel when his counsel failed to file a motion *in limine* to bar evidence of his prior rape conviction, thereby causing him not to testify. In 1981, defendant was convicted of rape for an incident that occurred in 1979, when defendant was 17 years old. He was released from prison in 1985. Defendant's attorney did not file a motion *in limine* to bar the introduction of the prior conviction as impeachment and informed defendant that because he was released from prison within 10 years of the commencement of this 1994 trial, his prior conviction could be used as impeachment if he testified. Defendant contends that, due to the remoteness in time of the prior conviction and its similarity to the instant case, his counsel could have persuaded the trial court that the probative value of the prior rape conviction was outweighed by the danger of unfair prejudice.

Evidence of a prior conviction is admissible only if the crime was punishable by death or imprisonment in excess of one year, or the crime involved dishonesty or false statement regardless of the punishment. *People v. Montgomery*, 47 Ill. 2d 510 (1971). In either case, however, the evidence is inadmissible if the trial judge determines that the probative value of the evidence is substantially outweighed by unfair prejudice. *Montgomery*, 47 Ill. 2d at 516. Also, evidence of a prior conviction is inadmissible if a period of 10 years has elapsed since the date of the conviction or defendant's release from prison, whichever is later. 47 Ill. 2d at 516.

Defense counsel certainly should have filed a motion *in limine* asking the court to bar the State from using defendant's prior conviction as impeachment on the basis that such impeachment is more prejudicial than probative. However, because defendant did not testify at trial, we can only speculate as to whether counsel's failure to file such a motion resulted in prejudice to defendant. See *People v. Hartfield*, 137 Ill. App. 3d 679, 484 N.E.2d 1136 (1985) (if prior convictions were not used to impeach defendant because defendant did not testify at trial, any prejudice to defendant is speculative). Therefore, we cannot conclude that counsel's failure to file a motion barring defendant's prior conviction was prejudicial to defendant or resulted in ineffective assistance of counsel.

■ Defendant's next contention is that the trial court erred in denying his motion to dismiss the indictment due to the destruction of the building in which the crime occurred before the defense had an opportunity to inspect the scene. The trial court denied defendant's motion based on information it obtained through the court's independent investigation.

Trial courts are authorized to dismiss an indictment where there is a denial of due process. *People v. Young*, 220 Ill. App. 3d 488, 581 N.E.2d 241 (1991). However, in ascertaining due process violations on a motion to dismiss an indictment, courts must proceed with restraint and dismiss the indictment only when the violation is clear and has been found with certainty. *People v. Shaw*, 133 Ill. App. 3d 391, 478 N.E.2d 1142 (1985). A defendant who seeks the dismissal bears a heavy burden of showing an actual and substantial prejudice to him. *People v. Haag*, 80 Ill. App. 3d 135, 399 N.E.2d 284 (1979).

Despite the fact that the trial court improperly conducted an independent investigation into the destruction of the crime scene, we do not believe that this investigation denied defendant due process. In order to show a due process violation due to the destruction of evidence, a criminal defendant must show bad faith on the part of the police in failing to preserve potentially useful information. *Arizona v. Youngblood*, 488 U.S. 51, 102 L. Ed. 2d 281, 109 S. Ct. 333 (1988). However, where evidence is requested by the defense in a discovery motion, a bad-faith showing need not be made. *People v. Newberry*, 166 Ill. 2d 310, 652 N.E.2d 288 (1995). Furthermore, where a government agency other than the State's Attorney destroys the evidence, no constitutional violation exists unless the agency was functioning as an aid in the prosecution. *In re C.J.*, 166 Ill. 2d 264, 652 N.E.2d 315 (1995).

Defendant did not file a discovery request requesting the preservation and examination of the crime scene. Furthermore, at the

hearing on the motion to dismiss the indictment, defendant made no showing that the building was destroyed in bad faith or that the city acted as the State's agent in destroying the building. Thus, although the trial court should not have relied only on information obtained through its own independent investigation, we do not believe that that information changed the result here.

■ Defendant next contends that the prosecutor improperly commented that defendant's behavior was typical of a child molester. We agree with defendant that this comment was improper. See *People v. King*, 248 Ill. App. 3d 253, 618 N.E.2d 709 (1993). However, we do not believe that this comment so prejudiced defendant as to require a new trial.

■ Defendant lastly contends, and the State concedes, that the trial court erred in sentencing defendant to an extended term for the aggravated criminal sexual assault, since he was also convicted of first degree murder. An extended-term sentence may only be imposed on the most serious offense of which an accused is convicted. *People v. Jordan*, 103 Ill. 2d 192, 469 N.E.2d 569 (1984). Defendant's extended-term sentence for his aggravated criminal sexual assault conviction must therefore be vacated and this cause remanded to the trial court for resentencing on that conviction.

Affirmed in part, vacated in part and remanded in part.

GORDON and HOURIHANE, JJ., concur.