THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LOUIS HILL, Defendant-Appellant.

First District (2nd Division)   No. 1—96—2863

Opinion filed February 17, 1998.—Rehearing denied March 31, 1998.

Rita A. Fry, Public Defender, of Chicago (James S. Jacobs, Assistant Public Defender, of counsel), for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb and Linda Woloshin, Assistant State's Attorneys, of counsel), for the People.

JUSTICE COUSINS delivered the opinion of the court:

After a bench trial, defendant Louis Hill was found guilty of first degree murder, home invasion, armed robbery, residential burglary, robbery and armed violence. The trial court sentenced defendant to consecutive sentences of natural life imprisonment for murder, an extended-term of 60 years for home invasion and 30 years for armed robbery.

On appeal defendant argues that: (1) the trial court erred in imposing an extended term for home invasion where the trial court had already imposed an "extended term" for first degree murder, the most serious offense for which he was convicted; (2) the trial court exceeded the statutorily permissible maximum sentence for an extended term for first degree murder where the trial court sentenced defendant to natural life and the maximum allowable extended-term sentence for murder is 100 years; (3) he was not proven guilty beyond a reasonable doubt of armed robbery because the evidence established that he did not use a weapon in the taking of any property and any

force that he did use was not utilized to further the goal of taking the victim's property; (4) he was not proven guilty of armed robbery beyond a reasonable doubt where there was no evidence corroborating the offense apart from defendant's statement; (5) he was not proven guilty beyond a reasonable doubt of home invasion because he was voluntarily admitted to the victim's home and the evidence established that he did not have a prior intent to commit a crime; (6) the trial court abused its discretion in sentencing him to natural life imprisonment; and (7) he is entitled to an additional 882 days of sentence credit under *People v. Robinson*, 172 Ill. 2d 452, 667 N.E.2d 1305 (1996), because he was sentenced to three consecutive terms of imprisonment and had been in custody on all three offenses for a total of 441 days.

BACKGROUND

On May 7, 1995, Wardell Jackson, age 70, was found murdered in her home located at 8038 South Wabash. Jackson lived alone in a rear coach house at that location while defendant and his wife lived in the front house. After the body was discovered, defendant was interviewed by police and ultimately confessed to the circumstances surrounding Jackson's death. At trial, defendant's confession was introduced into evidence via a stipulation.

In his statement, defendant explained that he had known Jackson for five years and that he and his wife had a set of keys to Jackson's home. On May 5, 1995, defendant called Jackson on the phone and asked if he could borrow some money. Jackson agreed and defendant went to her house. Jackson met defendant at her front door and gave him $10. When he was standing at the door, defendant saw a black man and woman inside Jackson's home, but he did not know who they were. Defendant used the money to buy cigarettes and a bottle of liquor.

Around 10:30 p.m., defendant called Jackson a second time and asked to borrow more money. Jackson agreed and defendant went to her front door again. He saw the same man and woman at Jackson's house that he had seen before. Jackson told defendant that she was going to tell his wife that he was getting money from her. In response, defendant told Jackson that he did not want her to tell his wife because he and his wife would get into fights and arguments if his wife found out. Defendant left and used the $10 to buy crack cocaine.

In his statement, defendant explained that he returned to Jackson's house around 1:30 a.m. to tell Jackson not to tell his wife that she had given him money. He rang the doorbell and Jackson let

him in. Jackson locked the front door and the two went into the kitchen. Defendant told Jackson not to tell his wife about the money. He then grabbed her and began "shaking her like a rag doll." While he was shaking her, he pushed her and Jackson stumbled backwards and fell. As she fell, she hit her head on something. Defendant saw blood by her head and went to see if she was breathing. He then started to leave the house but stopped to take $10 to $13 that he saw on a table. He then took some papers and clothes from the bedroom to make it look as if someone had broken into Jackson's home. Since the front door was locked, defendant went to the back door of the house, kicked the door open, and went home.

Around 5 a.m., defendant returned to Jackson's home and entered through the back door. He saw that Jackson was lying where he left her and he did not think that she was breathing. Defendant decided to cause more damage to make it look as if someone had broken into the house. He had brought a chisel with him from his house and used the chisel to make pry marks and scratches on the outside back door. He then found a box cutter in Jackson's home and used it to cut Jackson's throat. Defendant then left Jackson's home, drove around in his car and threw the box cutter out of the window while driving on the Dan Ryan expressway.

Flora Johnson, defendant's wife, testified at trial and stated that she had known Jackson her whole life. On May 7, 1995, Johnson called Jackson to go to church with her and defendant, as they usually did. When Jackson did not answer her phone or door, Johnson asked a neighbor to call the police. The police arrived and discovered Jackson's body. Johnson and defendant went to the police station to provide information. It was in the course of this visit that defendant confessed.

Rebecca Jones and James Williams, the two people who had been present in Jackson's home when defendant came to borrow money from Jackson, both testified at trial. They corroborated defendant's version of events that defendant called and visited Jackson twice while they were there. Jones and Williams left Jackson's home at 1:15 a.m., and Williams spoke to Jackson on the phone around 2:15 or 2:30 a.m. for a couple of minutes.

Detective Ted Przepiora, who investigated Jackson's home following the discovery of her body, testified that, in examining the rear of Jackson's residence, he noticed that the outside storm door had damage and pry marks to the bolt lock area and that the frame or strike plate of the door was damaged. The inner wooden door had a shattered glass plate and tool marks around the lock area. It was the detective's opinion that the force exerted on the door had come from the inside and not the outside.

Detective Przepiora then entered the home and walked into the rear bedroom of the house, where he found Jackson lying along her bed against the south wall of her bedroom. Her right arm was across the bed and a bloody telephone was lying beside her. A telephone wire was around her head area. There was a gaping wound to her throat and trauma about her face. The bed was soaked with blood and there were several blood spatterings about the west and north walls. A screwdriver was discovered in the doorway to the bedroom. On the dresser was an open purse, but there was no money inside.

The pathologist's findings were entered into evidence via a stipulation. The pathologist would testify that it was his opinion that Jackson died of massive bleeding due to an incised wound of the neck involving the left carotid artery, the left jugular vein and the left superior thyroid artery and vein. The pathologist could not reach an opinion as to whether the victim was conscious or unconscious at the time of that injury, but it was his opinion that she was alive when the fatal injury was inflicted.

The trial court found defendant guilty on all counts and the case proceeded to sentencing where the trial court found defendant eligible for the death penalty. After hearing aggravating and mitigating evidence, defendant was sentenced to life imprisonment for his murder conviction, an extended term of 60 years for his home invasion conviction and 30 years for his armed robbery conviction.

We affirm in part and vacate in part.

ANALYSIS

I

■ Defendant first contends that the trial court erred in imposing an extended term for home invasion where the trial court had already imposed an "extended term" for first degree murder, which was the most serious offense for which he was convicted. Defendant has waived review of this issue because he failed to object during the sentencing hearing and failed to file a timely postsentencing motion. *People v. Reed*, 177 Ill. 2d 389, 393, 686 N.E.2d 584 (1997). However, we believe the issue warrants review under the doctrine of plain error. 134 Ill. 2d R. 615(a); *People v. Askew*, 273 Ill. App. 3d 798, 806, 652 N.E.2d 1041 (1995) ("The erroneous imposition of an extended-term sentence on a defendant affects his fundamental right to liberty").

Defendant argues that since murder was the most serious offense of which he was convicted, his extended-term sentence of 60 years for home invasion was error.

■ Section 5—8—2 of the Unified Code of Corrections (Code) provides:

"§ 5—8—2. Extended Term. (a) A judge shall not sentence an offender to a term of imprisonment in excess of the maximum sentence authorized by Section 5—8—1 for the class of the most serious offense of which the offender was convicted unless the factors in aggravation *** were found to be present. Where the judge finds that such factors were present, he may sentence an offender to the following:

(1) for first degree murder, a term shall be not less than 60 years and not more than 100 years." 730 ILCS 5/5—8—2 (West 1994).

Generally, under this statute, a defendant who is convicted of multiple offenses of varying classifications can receive an extended term for only the most serious offense of which the defendant was convicted. *People v. Jordan*, 103 Ill. 2d 192, 206, 469 N.E.2d 569 (1984). However, Illinois courts have disagreed on whether the statute prohibits extended-term sentences in situations when an indeterminate sentence such as natural life imprisonment is imposed, since a sentence of life imprisonment cannot be extended under section 5—8—2(a)(1). *E.g.*, compare *People v. Young*, 124 Ill. 2d 147, 529 N.E.2d 497 (1988), to *People v. Henderson*, 142 Ill. 2d 258, 568 N.E.2d 1234 (1990). In *Young*, the supreme court held that an extended term may be imposed for the most serious conviction other than murder where a defendant is convicted of multiple offenses and life imprisonment is imposed for murder. *Young*, 124 Ill. 2d at 162. The supreme court explained that the authorization in section 5—8—2 to impose an extended-term sentence applies only to sentences of imprisonment involving terms of years. Since a natural life sentence is not a term of imprisonment and does not involve a fixed term of years, the authorization in section 5—8—2 to impose an extended-term sentence does not apply to a sentence of natural life. *Young*, 124 Ill. 2d at 164. Thus, an extended term may be imposed for the most serious conviction other than murder where the defendant is sentenced to life imprisonment.

However, in *People v. Henderson*, 142 Ill. 2d 258, 568 N.E.2d 1234, without mentioning *Young* and with no discussion whatsoever, the supreme court construed section 5—8—2 to require that the defendant's extended-term sentence for aggravated criminal sexual assault be reduced to a nonextended term in light of the defendant's death sentence for his murder conviction. The court stated that since "murder was the most serious offense of which defendant was convicted," "[t]he sentencing judge *** erred in imposing [the] extended-term sentence." *Henderson*, 142 Ill. 2d at 332-33.

Thereafter, in *People v. Askew*, 273 Ill. App. 3d 798, 652 N.E.2d 1041 (1995), this court noted that the result in *Henderson* could not be reconciled with the reasoning in *Young* and assumed that *Henderson* implicitly overruled *Young. Askew*, 273 Ill. App. 3d at 807. The *Askew* court chose to follow the decision in *Henderson* and reduced a defendant's extended-term sentence for armed robbery because, in light of the defendant's sentence to natural life for murder, it was not the most serious offense for which he was convicted. *Askew*, 273 Ill. App. 3d at 807. See also *People v. Maxson*, 285 Ill. App. 3d 585, 673 N.E.2d 1110 (1996) (First District Appellate Court vacated extended-term sentence for aggravated criminal sexual assault because defendant had also been sentenced to natural life for first degree murder). However, despite the supreme court's holding in *Henderson*, the Second District Appellate Court chose to follow *Young*, finding it well reasoned. *People v. Simpson*, 286 Ill. App. 3d 1034, 1040, 678 N.E.2d 74 (1997).

■ In the instant case, the State argues that this court should also return to the precedent established in *Young*. We decline to do so and choose to follow the precedent established in this district in *Askew* and *Maxson*. Accordingly, we reduce defendant's 60-year sentence for home invasion to 30 years, the maximum sentence authorized for a Class X felony under section 5—8—1(a)(3) of the Code. 730 ILCS 5/5—8—1(a)(3) (West 1994). See *People v. Askew*, 273 Ill. App. 3d at 807.

II

Defendant next contends that the trial court exceeded the statutorily permissible maximum sentence for an extended term for first degree murder by sentencing defendant to natural life where, under section 5—8—2(a)(1) of the Unified Code of Corrections, the maximum allowable extended-term sentence for murder is 100 years. 730 ILCS 5/5—8—2(a)(1) (West 1994). Defendant points to comments made by the trial court at sentencing and argues that the court was mistaken as to the allowable maximum sentence. At the sentencing hearing, the trial court stated in relevant part:

> "[A]s to count one, intentional murder, because the Court finds that the conduct of the defendant in taking the life in this case of Ms. Jackson, that it will be the judgment of this Court that the defendant is eligible to be sentenced for an extended term, because his conduct was indicative—was heinous and brutal, indicative of wanton cruelty, and the Court will impose therefore a sentence of life imprisonment as to the crime of first degree murder."

Defendant has also failed to preserve this issue for review. However, even if the issue were not waived, it is our view that the trial court did not err.

■ A misunderstanding of the minimum sentence by the trial judge necessitates a new sentencing hearing only when it appears that the mistaken belief of the judge arguably influenced the sentencing decision. *People v. Eddington*, 77 Ill. 2d 41, 48, 394 N.E.2d 1185 (1979). The *Eddington* standard applies to cases in which the trial court mistakenly believed that a defendant was eligible for an extended-term sentence. *People v. Hurley*, 277 Ill. App. 3d 684, 687, 661 N.E.2d 460 (1996), citing *People v. White*, 114 Ill. 2d 61, 68, 499 N.E.2d 467 (1986), and *People v. Fletcher*, 156 Ill. App. 3d 405, 415, 509 N.E.2d 625 (1987). In considering whether a mistaken belief influenced the trial court's sentencing decision, courts look to whether the trial court's comments show that the court relied on the mistaken belief or used the mistaken belief as a reference point in fashioning the sentence. See *Eddington*, 77 Ill. 2d at 48; see also *People v. Connor*, 82 Ill. App. 3d 652, 661, 402 N.E.2d 862 (1980); *People v. Musial*, 90 Ill. App. 3d 930, 935, 414 N.E.2d 63 (1980).

■ In the instant case, in evaluating the case for sentencing purposes, the trial court stated that defendant was eligible for an extended term but then sentenced defendant to a term of natural life, which is not an extended term. See 730 ILCS 5/5—8—2(a)(1) (West 1994) (extended term for murder is 100 years). However, there is no indication in the record that the trial court mistakenly believed that natural life is an extended term for murder or used such a belief as a point of reference in sentencing defendant. Rather, the trial court's specific delineation of the factors that authorize a sentence of natural life imprisonment for first degree murder indicates that the trial court understood the law and properly applied it. Thus, the record does not support a conclusion that the sentence was a product of a mistaken belief by the trial court or that the trial court was unaware of the correct sentencing parameters.

Defendant cites *People v. Hausman*, 287 Ill. App. 3d 1069, 679 N.E.2d 867 (1997), which we believe is distinguishable. In *Hausman*, the appellate court vacated defendants sentence and remanded for a new sentencing hearing when the trial court told the defendant that he would receive the minimum sentence of three years. The minimum sentence was in fact two years. *Hausman*, 287 Ill. App. 3d at 1071. In the case *sub judice*, however, the trial court did not fail to follow statutory guidelines and did not impose a sentence that was impermissible under the statute.

## III

Defendant also challenges the sufficiency of the evidence to support his conviction for armed robbery. He first argues that the evi-

dence established that he did not use a weapon in the taking of any property and any force that he did use was not utilized to further the goal of taking Jackson's property. Defendant also maintains that he was not proven guilty of armed robbery beyond a reasonable doubt because there was no evidence corroborating the offense apart from his statement. We believe defendant was properly found guilty beyond a reasonable doubt of armed robbery.

■ The standard of review is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Saunders*, 235 Ill. App. 3d 661, 671, 601 N.E.2d 1038 (1992). After carefully reviewing the record, we believe a rational trier of fact could have found defendant guilty of armed robbery beyond a reasonable doubt. The offense of armed robbery requires proof that the defendant was armed with a dangerous weapon at the time the robbery was committed. *People v. Hampton*, 149 Ill. 2d 71, 87, 594 N.E.2d 294 (1992). The gist of armed robbery is simply the taking of another's property by force or threat of force. *People v. Lewis*, 165 Ill. 2d 305, 338, 651 N.E.2d 76 (1995). However, as long as there is some concurrence between the defendant's threat of force and the taking of the victim's property, a conviction for armed robbery is proper. *Lewis*, 165 Ill. 2d at 339; *People v. Strickland*, 154 Ill. 2d 489, 524, 609 N.E.2d 1366 (1992); *People v. Wilson*, 254 Ill. App. 3d 1020, 1059, 626 N.E.2d 1282 (1993). Furthermore, convictions for armed robbery will be upheld on review when the defendant's use of threat or force and the taking are found to be a series of continuous acts. See *Strickland*, 154 Ill. 2d at 497; *Wilson*, 254 Ill. App. 3d at 1059; see also *People v. Saunders*, 235 Ill. App. 3d 661, 601 N.E.2d 1038 (1992).

In *Wilson*, defendant grabbed a police officer's gun during a traffic stop and shot the officer in the head. Then he shot another police officer who was also at the scene. He then told his codefendant to grab the other officer's gun and they drove away. On appeal, the defendant argued that he was not proven guilty of armed robbery because the evidence did not establish that he was armed when he took the officer's gun or that he used force to cause either officer to relinquish possession of his gun. *Wilson*, 254 Ill. App. 3d at 1059. The appellate court rejected defendant's argument and found that the initial taking of the gun was by force and against the officer's will and that defendant was able to keep the officer's gun by putting an end to any possible resistance by the officer by use of the weapon. The court upheld the conviction after concluding that the offenses of armed robbery and murder were a single series of continuous acts. 254 Ill. App. 3d at 1059.

In *Saunders*, the defendant attacked his victim, stabbed her in the neck with a knife, and then took $700 from the victim's apartment. The appellate court concluded that it made no difference whether the defendant took the money after the victim was dead or "whether the purpose of using force [against the victim] was as a means to kill," because the initial attack was provoked because of money, and force was used as a means to take the money. *Saunders*, 235 Ill. App. 3d at 672. Therefore, the court stated, there was the necessary concurrence between the defendant's use or threat of force and his taking of the money to sustain the conviction. *Saunders*, 235 Ill. App. 3d at 672.

Similarly, in the instant case, defendant rendered Jackson unconscious when he pushed her and took money when he left her house. It was not until he returned to Jackson's house that he used a weapon, the box cutter, which he used to cut Jackson's throat. However, he was able to keep Jackson's money and carry it away by putting an end to any possible resistance by Jackson by use of the box cutter. Therefore, there was a necessary concurrence between the use of force and the taking because the robbery and the murder were a single series of continuous acts.

■ Defendant also argues that there was insufficient evidence admitted at trial to corroborate his statement and the *corpus delicti* of the offense. However, we conclude that there was sufficient independent evidence to corroborate the circumstances related in defendant's confession relative to his conviction for armed robbery.

The *corpus delicti* rule requires only that the evidence apart from the defendant's confession tend to show that a crime was committed; the independent evidence need not establish the crime beyond a reasonable doubt. *People v. Furby*, 138 Ill. 2d 434, 450, 563 N.E.2d 421 (1990). There is no requirement that the independent evidence and the details of the confession correspond in every particular. *Furby*, 138 Ill. 2d at 451. What is necessary are facts or circumstances independent of the confession and consistent therewith that tend to confirm and strengthen the confession. *Furby*, 138 Ill. 2d at 452. Furthermore, the *corpus delicti* may be proved by circumstantial evidence. *People v. Lee*, 222 Ill. App. 3d 436, 441, 584 N.E.2d 185 (1991).

Here, the scene discovered by Detective Przepiora corresponded to the events described by defendant in his confession. Przepiora found that the outside storm door to the rear door of the home had damage and pry marks consistent with the damage defendant described doing with the chisel. Furthermore, Przepiora found Jackson in her bedroom, where defendant stated that she fell. Przepiora found a purse in Jackson's bedroom, but there was no

money in it. Finally, the testimony of Rebecca Jones and James Williams corroborated defendant's version of the events relative to his visits to Jackson for money on the night of the incident. The testimony of these witnesses relative to the time of the occurrence and the condition of the premises corroborated a number of circumstances related in defendant's confession. We therefore conclude that the record contains sufficient proof of the *corpus delicti* of defendant's conviction for armed robbery.

## IV

■ Defendant also argues that he was not proven guilty beyond a reasonable doubt of home invasion because he was voluntarily admitted to Jackson's home and because the evidence established that he did not have a prior intent to commit a crime at the time of his entry. We disagree.

When a defendant comes to a private residence and is invited in by the occupant, the authorization to enter is limited and criminal actions exceed this limited authority. *People v. Peeples*, 155 Ill. 2d 422, 487, 616 N.E.2d 294 (1993). However, where the defendant enters with an innocent intent, that entry is authorized and criminal actions thereafter engaged in by the defendant do not change the status of the entry. *People v. Bush*, 157 Ill. 2d 248, 254, 623 N.E.2d 1361 (1993). Thus, the determination of whether an entry is unauthorized depends on whether the defendant possessed the intent to perform a criminal act therein at the time of entry. *Bush*, 157 Ill. 2d at 254.

There is no dispute that Jackson authorized defendant's initial entry into her home before he inflicted her initial injuries. However, defendant's second entry into Jackson's home was not authorized. Jackson was unconscious when defendant returned to her home at 5 a.m. In his confession, defendant stated that he went to Jackson's home with a chisel that he had taken from his home in order to make it look as if someone broke into Jackson's home. Defendant then entered Jackson's home through the back door. Thus we believe that it was reasonable for the trial court to infer from the facts presented at trial, particularly the fact that defendant took a chisel with him on his last visit to Jackson's home, that defendant had the requisite intent to commit a criminal act when he entered Jackson's home at 5 a.m. See *People v. Hopkins*, 229 Ill. App. 3d 665, 672, 593 N.E.2d 1028 (1992) (the State can prove a defendant's intent by inferences drawn from his conduct and from surrounding circumstances).

## V

■ Defendant complains that the trial court abused its discretion

in sentencing him to natural life. Section 5—8—1(a)(1)(b) of the Unified Code of Corrections authorizes a sentence of natural life imprisonment for a first degree murder that is "accompanied by exceptionally brutal or heinous behavior, indicative of wanton cruelty." 730 ILCS 5—8—1(a)(1)(b) (West 1994). Our review of the record indicates that defendant failed to raise this issue during sentencing or in a postsentencing motion; therefore, the issue is waived on appeal. However, assuming that the issue was not waived, we believe the evidence here was sufficient to establish that defendants killing of Jackson, an elderly woman, was exceptionally brutal or heinous so as to sustain his sentence. The evidence indicated that Jackson was unarmed and defenseless. See *People v. Saunders*, 235 Ill. App. 3d 661, 673, 601 N.E.2d 1038 (1992). Furthermore, the evidence indicates that defendant cut Jackson's throat with a box cutter while she lay unconscious. Accordingly, we believe that the evidence supports defendant's sentence to natural life since the murder in the instant case of an elderly woman by beating and stabbing was heinous behavior indicative of wanton cruelty.

VI

Relying on *People v. Robinson*, 172 Ill. 2d 452, 667 N.E.2d 1305 (1996), defendant finally argues that the trial court erred when it gave him credit for time spent in jail only as to one of his sentences and not as to all. Defendant therefore contends that he is entitled to an additional 882 days of sentence credit because he was sentenced to three consecutive terms of imprisonment and had been in custody prior to trial on all three offenses for a total of 441 days. Defendant has waived this issue for review. However, we will address this issue under the doctrine of plain error.

■ Section 5—8—4(e)(4) of the Unified Code of Corrections (Code) provides, in pertinent part:

> "In determining the manner in which consecutive sentences of imprisonment *** will be served, the Department of Corrections shall treat the offender as though he had been committed for a single term with the following incidents:
>
> * * *
>
> (4) the offender shall be awarded credit against the aggregate maximum term and the aggregate minimum term of imprisonment for all time served in an institution since the commission of the offense or offenses ***." 730 ILCS 5/5—8—4(e) (West 1994).

Under this section, consecutive sentences are treated as though they were a single term for the limited purpose of parole eligibility and good-time credit. *People v. Cunitz*, 59 Ill. App. 3d 701, 705, 375 N.E.2d 1020 (1978). Prior to the supreme court's decision in *Robinson*, credit

was not given for those days spent serving a prison term for a prior, unrelated offense while awaiting custody on a current offense. Courts reasoned that, when dealing with consecutive sentences, the second or new sentence did not begin to run until the other had been completed, because to give a defendant credit as to both sentences would serve to reduce his sentence by twice the time of the defendant's prior incarceration. *People v. Pluskis*, 162 Ill. App. 3d 449, 454, 515 N.E.2d 480 (1987); *People v. Mata*, 243 Ill. App. 3d 365, 377, 611 N.E.2d 1235 (1993); *People v. Plair*, 292 Ill. App. 3d 396, 686 N.E.2d 28 (1997).

However, in *People v. Robinson*, 172 Ill. 2d 452, 667 N.E.2d 1305, the supreme court held that a defendant in custody on two unrelated offenses is simultaneously in custody on both charges and should receive sentence credit pursuant to section 5—8—7(b) of the Code for the time the defendant is in custody awaiting trial and sentencing on both charges. *Robinson*, 172 Ill. 2d at 459. Section 5—8—7(b) of the Code provides that the offender "shall be given credit on the determinate sentence *** for time spent in custody as a result of the offense for which the sentence was imposed." 730 ILCS 5/5—8—7(b) (West 1994). While out on bond awaiting trial on one charge, the *Robinson* defendant committed another offense and surrendered in exoneration of the first bond. Focusing on the use of the singular form of the words "sentence" and "offense" in section 5—8—7(b), the supreme court concluded that the defendant was in simultaneous custody on both offenses and held that, under section 5—8—7(b), he was entitled to in-custody credit for each of his offenses. *Robinson*, 172 Ill. 2d at 463.

The Second District Appellate Court, in *People v. Johnson*, 286 Ill. App. 3d 597, 676 N.E.2d 1040 (1997), *appeal denied*, 173 Ill. 2d 536 (1997), followed the holding in *Robinson* and awarded a defendant separate credit against each of his consecutive sentences. *Johnson*, 286 Ill. App. 3d at 768. But the Fourth District Appellate Court, in *Feazell v. Washington*, 291 Ill. App. 3d 766, 684 N.E.2d 1052 (1997), disagreed with the holding in *Johnson* and found *Robinson* distinguishable. The *Feazell* court stated in relevant part:

> "Determinations of the manner in which consecutive sentences are to be imposed are encompassed by section 5—8—4(e) of the Code. ***
>
> *** Since *Robinson* does not entail the imposition of consecutive sentences pursuant to section 5—8—4(e) of the Code, we find it inapplicable here. The precedential scope of a decision is limited to its facts. [Citation.]" *Feazell*, 291 Ill. App. 3d at 768.

Thereafter, in *People v. Plair*, 292 Ill. App. 3d 396, 686 N.E.2d 28

(1997), the Fifth District Appellate Court also chose not to follow *Johnson* in its interpretation of *Robinson* and concluded that *Robinson* did not address the issue of consecutive sentences. 292 Ill. App. 3d at 401, 686 N.E.2d at 32. See also *People v. Biggs*, 294 Ill. App. 3d 1046 (1998).

We agree with the Fourth and Fifth District Appellate Courts and also with *Biggs*, a recent first district opinion, and find *Robinson* distinguishable. Moreover, we reemphasize that neither *Robinson* nor *Johnson* makes reference to the consecutive sentencing provisions of section 5—8—4(e) of the Code. We do not believe a defendant should receive credit for double the amount of time served by converting much of a consecutive sentence into a concurrent one. See *Plair*, 292 Ill. App. 3d at 401, 686 N.E.2d at 33. Therefore, we hold that defendant is entitled to only a single credit for time served of 441 days.

For the foregoing reasons, we affirm in part and vacate in part.

Affirmed in part and vacated in part.

McNULTY, P.J., and RAKOWSKI, J., concur.