NO. 4-03-0872    Filed: 5/1/06

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Macon County |
| SHAWN R. STANDLEY, | ) | No. 03CF574 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Katherine M. McCarthy, |
| | ) | Judge Presiding. |

_____

PRESIDING JUSTICE TURNER delivered the opinion of the court:

In May 2003, the State charged defendant, Shawn R. Standley, with two counts of home invasion (720 ILCS 5/12-11(a)(3) (West 2002)).  After an August 2003 trial, a jury found defendant guilty of home invasion.  At a joint hearing in October 2003, the trial court denied defendant's posttrial motion and sentenced him to 21 years' imprisonment.

Defendant appealed, asserting (1) the State's evidence was insufficient to prove him guilty beyond a reasonable doubt; (2) the 15-year sentence enhancement mandated by Public Act 91-404 (Pub. Act 91-404, §5, eff. January 1, 2000 (1999 Ill. Laws 5126, 5131) (codified at 720 ILCS 5/12-11(c) (West 2002))) for violating section 12-11(a)(3) of the Criminal Code of 1961 (Criminal Code) (720 ILCS 5/12-11(a)(3) (West 2002)) is unconstitutional; and (3) if the sentence enhancement is unconstitutional, "the judicially imposed portion of his sentence" should

be allowed to remain.

In September 2005, this court affirmed defendant's conviction and sentence.  People v. Standley, 359 Ill. App. 3d 1096, 835 N.E.2d 945 (2005).  In January 2006, our supreme court vacated our judgment and remanded the cause to our court to reconsider our judgment in light of People v. Sharpe, 216 Ill. 2d 481, 839 N.E.2d 492 (2005), and People v. Guevara, 216 Ill. 2d 533, 837 N.E.2d 901 (2005), "to determine if a different analysis or result is required."  People v. Standley, 217 Ill. 2d 622, 622, 840 N.E.2d 1233, 1234 (2006).  Accordingly, we again address defendant's aforementioned arguments and again affirm the trial court's judgment.

## I. BACKGROUND

At around midnight on April 28, 2003, two males armed with guns kicked in the back door of a home at 2757 North Church Street, Decatur, Illinois, and entered the home.  The home belonged to Gary Lewis, Sharon Conaway, and their then eight-year-old son Garrett Lewis, who were all home at the time.  During the incident, one of the men hit Gary with a gun.  On May 23, 2003, the State charged both defendant and Michael Joyner with two counts of home invasion.

In August 2003, the trial court held a jury trial on defendant's charges.  The evidence relevant to the issues on appeal is set forth below.

Decatur police officer Lonnie Lewellyn testified he

arrived at the Church Street residence at 12:41 a.m. on August 28, 2003, in response to a report of a home invasion. There, he spoke with Gary, Sharon, and Garrett. Gary and Sharon were able to give descriptions of the two individuals, and Gary was also able to provide nicknames by which he knew them. He did not recall Gary mentioning defendant had facial hair but did recall Gary recognized the hair, eyes, and voice of both suspects. Officer Lewellyn did note Gary and Sharon told him that both suspects had taken off their bandanas.

Gary testified that around 12:15 a.m., he heard several loud booms coming from the kitchen area, which is attached to the back porch that contains an exterior door. Gary entered the kitchen, turned the lights on, and saw the door leading to the porch fly open. Two men then entered the kitchen with guns pointed at him. In court, Gary identified defendant as the first man who entered Gary's home. When defendant entered the home, he was wearing a bandana around his face that began right under his eyes and covered his mouth and nose. He was also wearing a hooded sweatshirt or jacket with the hood up.

Defendant ordered Gary to the floor, and Gary laid stomach down on the floor. He tried to keep his head up and observe what was taking place. After four or five demands for money and drugs, defendant told Gary to stand up and moved Gary to a recliner in the front room. The other man brought Garrett

- 3 -

into the front room, where Sharon was already located. According to Gary, he was in the kitchen about 7 to 10 minutes after seeing defendant, and the kitchen lights were on the entire time.

In the front room, defendant held a gun to the center of Gary's forehead for about 5 to 10 minutes and continued to demand money. During that time, defendant was directly in front of Gary and less than an arm's length away. The lights and television were on in the front room.

At some point, defendant asked Gary for his wallet, and Gary indicated it was in the bedroom. While still holding the gun to Gary's head, defendant walked Gary to the bedroom. The other man brought Sharon and Garrett into the bedroom. The lights were also on in there. Gary opened a drawer, and defendant removed the wallet. Defendant threatened to come back and shoot Gary if he was lying about not having money or drugs. Defendant then hit Gary across the face with a gun, knocking Gary unconscious. The men were gone when Gary regained consciousness.

Prior to April 28, 2003, Gary had seen defendant a few times through mutual friends. About three to four weeks before the incident, Gary had spoken a few words to defendant at the AIW Hall. Gary first had a notion defendant was the perpetrator when they entered the front room. When they reached the dresser in the bedroom, he got a good look at him because they were face-to-face, eye-to-eye. He observed defendant had two eyebrow rings

over one of his eyes, but he was unsure of which eye. He also noted defendant's bandana slipped down several times during the encounter but never got below his nose. Gary testified he was "very certain" and "positive" that defendant was the first man to enter his kitchen.

Gary acknowledged he had a prior felony for possession of a controlled substance and two new charges pending against him. He stated the State had not promised him leniency or a reward in exchange for his testimony.

Sharon testified she got a good look at the two men shortly after they entered the house and had not yet seen her. One was a white male, and the other was a mixed-race male. They were both wearing black hooded jackets and bandanas on their faces. She could not recall if the kitchen light was on. When the white male brought Gary into the living room, she was able to get a closer look at the white male. The lights were on in the living room. She identified defendant as the white male in her home. Sharon was "very sure" and "had no doubt" it was defendant. Sharon noted that during the incident, she was able to see defendant's face from the tip of his nose to his forehead, including the front of his hair. Defendant had two eyebrow rings on the portion of the left eyebrow closest to the ear. She also noted the mixed-race male took off his bandana after it had fallen down. She further testified the lights were on in the

bedroom as well. The closest she was to defendant was about five feet away.

According to Sharon, the entire incident lasted 20 to 25 minutes. She too had seen defendant a couple times before the incident and recalled Gary talking to him at the AIW Hall two or three weeks before the incident. During the incident, she recognized his voice. When the police officer arrived, she and Gary told the officer the mixed-race male was known as "mixed Mike" and the white male was "Shawn." Later, both she and Gary picked defendant's picture out of a photograph lineup as the white male that entered their home. Additionally, Sharon acknowledged she was currently on probation.

Decatur police officer Chad Ramey testified that on May 1, 2003, he met with Gary and Sharon and conducted a photograph lineup. He first showed the lineup to Gary, who pointed to defendant's photograph "rather quickly." He then showed the lineup to Sharon, who also pointed to defendant's picture "rather quickly." According to Officer Ramey, Sharon was unable to see Gary's identification of defendant. He did not recall any of the people in the lineup having eyebrow rings.

On May 21, 2003, Officer Ramey met with defendant, who had voluntarily showed up at the police department. He noticed that defendant had four holes over his left eyebrow where it had been pierced. He did not take a picture of defendant's eyebrow,

and the booking photograph was too blurry to see any holes.

Robert Lewellen, defendant's grandfather, testified that defendant had been residing at his home for 1 1/2 to 2 years prior to April 28, 2003, but defendant was not there April 27 or 28, 2003. According to Robert, defendant never had more than one eyebrow ring and sometimes did not wear it. Defendant also had a mustache and some chin hair. Robert identified some pictures of defendant, in which he had only one eyebrow ring and a mustache.

Ann Lewellen, defendant's grandmother, also testified defendant only had one eyebrow ring and wore a mustache in April 2003. She did not see defendant on April 27 or 28, 2003. She talked with her daughter Lori Blair on the afternoon of April 27, 2003. During the conversation, Lori indicated she could not spend the night at Ann's home because her son and defendant would make a mess. Ann again talked to Lori around 5 p.m. on April 28, 2003, and heard defendant's voice in the background.

Jeannine McCoy, defendant's mother, also testified defendant had a mustache, some other facial hair, and only one ring in his left eyebrow. On the night of April 27, 2003, she talked on the phone with her sister Lori from around 9 or 10 p.m. to somewhere between 11:30 p.m. and 1 a.m. During the phone conversation, she could hear defendant's voice in the background. Between 11:30 p.m. and 1 a.m., she heard defendant ask Lori if

she was still talking to his mom, and Jeannine told Lori to tell defendant "hi."

Lori testified defendant stayed at her home the entire day of April 27, 2003, which was the day before her birthday. Defendant and her son only left for 5- to 10-minute periods to smoke a cigarette. That same day, she and Jeannine talked on the phone until past midnight, and she recalled defendant telling her to say "hi" to his mom around midnight. Lori also stated she saw defendant after midnight and as late as 1 a.m. on April 28, 2003. Lori's two children, Samantha Blair and Christopher Austin, also testified defendant was at their home between 12 and 1 a.m. on April 28, 2003.

Defendant testified on his own behalf. He stated he was at Lori's home during the late-night hours of April 27 and the early morning hours of April 28, 2003. He only left the house for five-minute periods to smoke with Christopher. He had never been to Gary and Sharon's home and did not know them on a personal level. He did believe they had crossed paths before. He also had never met Joyner, his alleged codefendant, prior to his arrest for this offense. Defendant also denied ever wearing more than one eyebrow ring.

After hearing all the evidence, the jury found defendant guilty of home invasion.

In September 2003, defendant filed a posttrial motion.

In October 2003, the trial court held a joint hearing on defendant's motion and sentencing. Both parties agreed the 15-year sentence enhancement contained in section 12-11(c) of the Criminal Code (720 ILCS 5/12-11(c) (West 2002)) applied to defendant's conviction. The court denied defendant's motion and sentenced him to a total of 21 years' imprisonment. Defendant then appealed. As stated, we affirmed defendant's conviction and sentence on appeal, and the Supreme Court of Illinois vacated our judgment and remanded the cause to our court. We now reconsider defendant's arguments as directed by our supreme court.

## II. ANALYSIS

### A. Sufficiency of the Evidence

Defendant first asserts the State's evidence was insufficient to prove him guilty of home invasion beyond a reasonable doubt since he presented four alibi witnesses and the State's eyewitness testimony was "suspect."

When considering a defendant's challenge to the sufficiency of the evidence, the question for the reviewing court is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Proof beyond a reasonable doubt does not require the exclusion of every possible doubt. People v. Shevock, 335 Ill. App. 3d 1031, 1037, 782 N.E.2d 949, 954 (2003). Additionally, the jury had the

- 9 -

responsibility to (1) determine the witnesses' credibility and the weight given to their testimony, (2) resolve conflicts of the evidence, and (3) draw reasonable inferences from the evidence. People v. Johnson, 353 Ill. App. 3d 954, 956, 819 N.E.2d 1233, 1235 (2004).

An identification is insufficient to sustain a conviction if it is vague or doubtful. However, a single witness's identification of the accused is sufficient if the witness viewed the accused under circumstances permitting a positive identification. That remains true even in the presence of contradicting alibi testimony, provided that the witness had an adequate opportunity to view the accused and that the in-court identification is positive and credible. People v. Slim, 127 Ill. 2d 302, 307, 537 N.E.2d 317, 319 (1989). In evaluating identification testimony, Illinois courts consider the factors set forth in Neil v. Biggers, 409 U.S. 188, 199-200, 34 L. Ed. 2d 401, 411, 93 S. Ct. 375, 382 (1972), which are (1) the witness's opportunity to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the witness's level of certainty at the identification confrontation; and (5) the length of time between the crime and the identification confrontation. Slim, 127 Ill. 2d at 307-08, 537 N.E.2d at 319.

Here, we have more than one witness who identified

defendant as the perpetrator, and the <u>Neil</u> factors do not weigh in defendant's favor.  Since the perpetrator was in their home between 20 to 25 minutes, both Gary and Sharon had a lot of opportunities to view him.  Gary testified he was at an arm's length with the man for at least 10 minutes, and at one point, was able to look him straight in the eyes.  Additionally, Gary had met and talked to defendant on several prior occasions, including only three weeks before the incident.  Sharon said she was within five feet of defendant.  While Sharon was more focused on the other male, Gary tried to pay close attention to defendant's actions and, as stated, was able to look him straight in the face.

As to the accuracy of their initial description of the perpetrator, Gary recognized defendant by his voice, eyes, and hair and was able to provide defendant's first name to Officer Lewellyn.  Their identification of defendant as one of the perpetrators remained consistent since talking to the police shortly after the incident.  The only conflict between the victims' initial statements to the police and their trial testimony that related to defendant's description was as to whether the men's bandanas fell down and exposed their entire face.  Further, while defendant asserted he only had one eyebrow ring, Officer Ramey's testimony that defendant had four holes (two per eyebrow ring) supports Gary's and Sharon's consistent assertion

- 11 -

that the perpetrator had two rings.

Regarding the final two factors, both Gary and Sharon "rather quickly" picked defendant's photograph out of a lineup, which was conducted only three days after the incident. Gary and Sharon also did not waver or hesitate in stating defendant was one of the men who entered their home on April 28, 2003.

Moreover, the failure to notice facial hair is not fatal to a positive and otherwise credible identification. Slim, 127 Ill. 2d at 310, 537 N.E.2d at 320. The case People v. Marshall, 74 Ill. App. 2d 483, 221 N.E.2d 133 (1966), cited by defendant in support of his argument that the identification testimony was suspect, has been criticized and not followed. See Slim, 127 Ill. 2d at 313, 537 N.E.2d at 322. While defendant presented an alibi defense and asserted he had only one eyebrow ring and facial hair, the jury, as the trier of fact, had the responsibility to resolve the conflicting testimony. See Johnson, 353 Ill. App. 3d at 956, 819 N.E.2d at 1235.

Accordingly, we find the State's identification evidence was sufficient for the jury to find defendant guilty beyond a reasonable doubt.


B. 15-Year Sentence Enhancement

Defendant also argues his 15-year sentence enhancement for home invasion while armed with a firearm is unconstitutional because it violates the proportionate-penalties clause of the

- 12 -

Illinois Constitution (Ill. Const. 1970, art. I, §11).  We disagree.

Section 12-11(a)(3) of the Criminal Code (720 ILCS 5/12-11(a)(3) (West 2002)) provides as follows:

"(a) A person who is not a peace officer acting in the line of duty commits home invasion when without authority he or she knowingly enters the dwelling place of another when he or she knows or has reason to know that one or more persons is present or he or she knowingly enters the dwelling place of another and remains in such dwelling place until he or she knows or has reason to know that one or more persons is present and

* * *

(3) While armed with a firearm uses force or threatens the imminent use of force upon any person or persons within such dwelling place whether or not injury occurs[.]"

Section 12-11(c) of the Criminal Code (720 ILCS 5/12-11(c) (West 2002)) provides:

"Home invasion in violation of subsection (a)(1), (a)(2)[,] or (a)(6) is a Class X felony.  A violation of subsection (a)(3) is

- 13 -

a Class X felony for which 15 years shall be
added to the term of imprisonment imposed by
the court."

Prior to Sharpe, the Supreme Court of Illinois had used three separate tests to determine whether a statute violated the proportionate-penalties clause. See People v. Moss, 206 Ill. 2d 503, 522, 795 N.E.2d 208, 220 (2003). The first test is whether the penalty is "cruel, degrading, or so wholly disproportionate to the offense committed as to shock the moral sense of the community." Moss, 206 Ill. 2d at 522, 795 N.E.2d at 220. The second test is whether, when comparing similar offenses, "conduct that creates a less serious threat to the public health and safety is punished more severely." Moss, 206 Ill. 2d at 522, 795 N.E.2d at 220. The final test is whether offenses with identical elements are given different sentences. Moss, 206 Ill. 2d at 522, 795 N.E.2d at 220. In Sharpe, the supreme court abandoned the second test, which was known as the cross-comparison test. Sharpe, 216 Ill. 2d at 519, 839 N.E.2d at 516-17.

After the Sharpe decision, the Guevara court addressed the defendants' argument that the 15-year sentence enhancement for home invasion while armed with a firearm violated the proportionate-penalties clause under the cross-comparison test when compared to aggravated battery with a firearm. Guevara, 216 Ill. 2d at 544, 837 N.E.2d at 908. Our supreme court rejected the defendants' argument because Sharpe prohibits a defendant from raising a proportionate-penalties-clause challenge under the

cross-comparison test. <u>Guevara</u>, 216 Ill. 2d at 544-45, 837 N.E.2d at 908. The court further noted the defendants had not challenged the 15-year enhancement under one of the other proportionate-penalties-clause tests, and thus their proportionate-penalties-clause challenge failed. <u>Guevara</u>, 216 Ill. 2d at 545, 837 N.E.2d at 908.

Here, like the defendants in <u>Guevara</u>, defendant argues the 15-year sentence enhancement for home invasion while armed with a firearm violates the proportionate-penalties clause under the cross-comparison analysis when compared to aggravated battery with a firearm. He also does not argue the 15-year enhancement violates the proportionate-penalties clause under the other two tests. Accordingly, defendant's proportionate-penalties-clause argument fails.

Since we have rejected defendant's proportionate-penalties-clause challenge to the 15-year sentence enhancement, we need not address defendant's last argument.

### III. CONCLUSION

For the reasons stated, we affirm the trial court's judgment.

Affirmed.

STEIGMANN and APPLETON, JJ., concur.