2023 IL App (4th) 210503

No. 4-21-0503

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
February 2, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Sangamon County |
| DERRICK D. CRAWFORD, | ) | No. 20CF391. |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Jennifer M. Ascher, |
| | ) | Judge Presiding. |

PRESIDING JUSTICE DeARMOND delivered the judgment of the court, with opinion.

Justices Cavanagh and Doherty concurred in the judgment and opinion.

**OPINION**

¶ 1        Following a May 2021 bench trial, the court found defendant, Derrick D. Crawford, guilty of two counts of aggravated battery with a firearm (720 ILCS 5/12-3.05(e)(1) (West 2020)), Class X felonies. On August 11, 2021, the trial court sentenced defendant to consecutive 15-year terms in the Illinois Department of Corrections (DOC), followed by 3 years' mandatory supervised release (MSR). Defendant filed a motion to reconsider his sentence, which the trial court denied on August 25, 2021.

¶ 2        On appeal, defendant raises three challenges to his convictions and sentence, arguing that (1) the State failed to prove him guilty beyond a reasonable doubt because the victim's identification of him was unreliable and the remaining evidence circumstantial, (2) the trial court's mistaken belief that defendant was eligible for extended-term sentencing influenced the imposed

sentence, which should be vacated, and (3) the trial court failed to inquire into defendant's ineffective-assistance-of-counsel claim pursuant to *People v. Krankel*, 102 Ill. 2d 181, 464 N.E.2d 1045 (1984). We disagree and affirm the convictions and sentence.

¶ 3                                   I. BACKGROUND

¶ 4             In April 2020, the State charged defendant with four counts arising from a recent shooting: two counts of aggravated battery with a firearm (720 ILCS 5/12-3.05(e)(1) (West 2020)), Class X felonies; one count of unlawful possession of a weapon by a felon (720 ILCS 5/24-1.1(a) (West 2020)), a Class 2 felony; and one count of possession of a weapon by a street gang member (720 ILCS 5/24-1.8(a)(1) (West 2020)), a Class 2 felony. Heeding the State's report, the trial court admonished defendant he was eligible for extended term sentencing (6 to 60 years) on counts I and II, based on a prior juvenile adjudication, and extended term eligible (3 to 14 years) on counts III and IV, based on his adult criminal history. Over a year later, during a May 2021 pretrial hearing, the State again maintained defendant was extended term eligible for the Class X felony counts, based on a prior Class 1 felony juvenile adjudication. When defense counsel questioned the State's position, the trial court recessed to allow the parties to research the issue. Upon reconvening, the State claimed subsection 3.2(b) of the Unified Code of Corrections (Code) (730 ILCS 5/5-5-3.2(b) (West 2020)) applied to make defendant extended-term eligible, and defense counsel did not object. The matter then proceeded to a bench trial.

¶ 5                          A. General Undisputed Facts

¶ 6             The evidence from various eyewitnesses or expert witnesses established principal facts the defense did not dispute. On the afternoon of March 28, 2020, Lavonon Young and Markishaa Bolden prepared to take their 7-year-old son and 3-year-old nephew on a shopping trip to Wal-Mart. While Young finished getting ready inside their home at 1511 Seven Pines Road in

Springfield, outside Bolden secured the children in the backseat of her Kia Sorento parked in the driveway in front of their duplex. Bolden then sat in the driver's seat to wait for Young. As he emerged from the house, Young began yelling, jumped in the car's front passenger seat, and tried to cover Bolden. Two men dressed in black had opened fire on Bolden's vehicle. Young eventually reentered the duplex to retrieve a gun to return fire, but the shooters ran to their vehicle and sped off in a westbound direction. Bolden along with two others immediately reported the shooting by calling 911. Bolden and Young sustained serious injuries and were taken to a local hospital. Police recovered dozens of shell casings and projectiles from the scene, which confirmed two firearms were used. Moreover, police matched some shell casings to those recovered from shootings that occurred on March 30 and 31 in Springfield.

¶ 7                                    B. Identification Evidence

¶ 8          Moments after the shooting, Bolden called 911 for help. When the operator asked, "Did you see who did it?", Bolden answered, "Yes." And minutes later, while still in her car, Bolden told police she saw the shooters.

¶ 9          At the hospital the next day, Bolden spoke with detectives Jennifer Oglesby and Kim Overby. She provided a description of the shooter to the detectives—a "young black male" with a "caramel" complexion, standing "5'9 to 5'10" tall, who "was wearing dark clothing." Once detectives Oglesby and Overby left the room, Bolden viewed a photographic lineup. Officer Leroy Jett of the Springfield Police Department, who was not involved in the investigation of the shooting, administered the photo array. The entire process was audio-recorded and played during trial. Jett read Bolden the necessary admonishments and answered her questions. At the 53-second mark, pursuant to the written admonishment, Jett informed Bolden that the subject "may or may not be pictured in the photo array." At the 1:03-mark, going off script, Jett said he was "not

- 3 -

working the case, so the suspect I assume, uhm, is on those, okay?" Bolden said, "[O]kay." Beginning at the 1:11-mark, Jett read more admonishments and had Bolden complete some paperwork. Over the next two minutes, he twice more told Bolden that the suspect may not be in the photo array. He also told her she was not compelled to make an identification and it was just as important to exclude people as suspects. At the 3:20-mark, Jett showed Bolden the photo array—one sheet of paper with six separate photos on it. Thirteen seconds later, Bolden asked, "Is this the only one you have?" Jett responded, "That is the only one provided, correct." At the 3:44-mark, Bolden said, "I believe that's who it is." She picked number five, and Jeff confirmed her selection. She identified defendant from the lineup, telling Jett she recognized the shooter by his eyes. All told, Bolden identified defendant in less than 30 seconds and the lineup took approximately 6 minutes total, including the time for the admonishments, the identification, and completing the paperwork.

¶ 10     When Bolden testified at trial more than a year later, she recalled how, while she sat in her car waiting for Young, she looked to the left outside the driver's window and "saw a young man standing there with a gun and shooting." The shooter held the gun with two hands. Bolden testified she could not move once the shooting began because she was seat-belted-in and had been injured. She could do nothing but wait and explained she sat there "looking at him wondering when he was going to stop." Though the shooter wore a black hoodie, Bolden could see his face and described him as a younger African American. She could not recall a physical description of the second shooter who stood behind the first one, except that he was an African American male. Bolden made an in-court identification of defendant as one of the two men who shot her.

¶ 11                                   C. The Shooters' Vehicle

¶ 12          Several eyewitnesses recalled seeing the shooters' vehicle before it sped away. The second victim, Young, told police at the scene and later testified the shooters drove a "silver car." Shenae Burnom, who lived at 1515 Seven Pines, called 911 to report the shooting, stating the shooters drove a silver, four-door, midsize car. During her trial testimony more than a year later, Burnom recalled the shooters drove "like a greyish-color car." She could no longer remember anything about the make, model, or size of the car. Connie Hopkins, in what she termed a "vague description," told a 911 operator the shooters drove an "older model white SUV." Troy Johnson lived at 1531 Seven Pines Road on the day of the shooting. From his third-floor apartment, he saw the shooters' vehicle. At trial, he testified the vehicle "was like a van SUV *** [l]ike a tannish light brown color." Finally, David Tarr, who lived in a first-floor apartment at 1523 Seven Pines witnessed the shooting. He testified and identified the shooters' vehicle as a gray GMC Acadia.

¶ 13          The State called Travis Lascody, an officer with the Chatham Police Department, who testified that on the day of the shooting (March 28, 2020) he was dispatched to recover a vehicle that had been stolen in Chatham and later located in Springfield. He identified the stolen vehicle as a silver GMC Acadia. He testified the Acadia was owned by a Tracy Potter.

¶ 14          Potter testified she lived at 42 Circle Drive in March 2020 with her then-boyfriend, Christopher Jackson. She confirmed she previously owned a 2015 silver GMC Acadia, which she had reported stolen on March 28, 2020. She recalled she had been drinking with Jackson during the evening of March 27, into the morning of March 28, 2020. As they drank, Jackson used her cellphone (217-***-9721) to set up a transaction whereby he traded the use of her Acadia for drugs. Jackson arranged the exchange via text message. Potter testified she did not know who Jackson was texting. She noted, in the early hours of March 28, several men arrived to make the

exchange, but only two men entered the apartment. She described them as "male, black, gold teeth." She said one man was tall and the other short. The other men waited outside in a dark sedan. When daylight came and Potter sobered-up, she tried to get her Acadia back. Using the same text thread Jackson used to arrange the trade (replying to number 217-***-0819), she texted, "I need my vehicle" at approximately 8:30 a.m. on March 28. Potter testified the men never returned her vehicle and she reported it stolen later that day. On cross-examination, she admitted she lied to police about her vehicle being stolen, but she explained she lied because she panicked. Potter admitted she did not cooperate with police when she refused to view a photo array or an in-person line-up to identify the men who came inside her apartment, explaining she "was not comfortable."

¶ 15    The State presented surveillance video footage from Spring Meadow Apartments, located at 3117 Butler Street in Springfield, dated March 28, 2020, where police eventually found Potter's Acadia. The parties stipulated to the video's foundation and authenticity. The video showed Potter's silver GMC Acadia arriving at the apartment complex and being parked in the parking lot. Three young men emerged from the Acadia, two clad in dark hooded sweatshirts. The three men got into a dark, four-door sedan and left the apartment complex.

¶ 16                                D. Cellphone Evidence

¶ 17    The State called Timothy Zajicek, a detective with the Springfield Police Department, who testified he received training in violent crime investigation, computer and forensic investigations, and cell phone and Cellebrite extractions. Zajicek testified he performed a digital extraction on defendant's cell phone on April 9, 2020. He explained the extraction process and what information could be gleaned from it. Through Zajicek's testimony, the State laid the foundation for several exhibits containing his extraction reports.

¶ 18    Detective Oglesby testified she prepared search warrants for defendant's phone, particularly a warrant sent to AT&T for number 217-***-0819. She explained how defendant's phone records tied him to Potter because of the text exchanges about trading her car for narcotics. Oglesby further testified defendant's phone records placed his phone "at 399 North Main in Chatham, Illinois" at 4:38 am on March 28, 2020, which was "within a half-mile of 42 Circle Drive"—Potter's residence.

¶ 19                          E. Jailhouse Phone Calls

¶ 20    Through Oglesby's testimony, the State played audio recordings of defendant's jail phone calls. In calls to his mother and sister, defendant referenced having multiple cellphones. He also asked his mother to erase the data from his phones, and the next day she confirmed she did. Defendant also asked his mother to "deactivate my Facebook" and provided her the necessary identification and password to do so. He likewise talked with his mother about his Snapchat account and password. Defendant's passwords related to known gang names and gang members.

¶ 21    In other phone calls, defendant complained about how his cohorts had been speaking with police and saying he had shot Bolden and Young. In various calls, he tried to discern who specifically had talked with police. In another phone call, defendant speaks with a woman who tells him she had been told "that I need to get on the stand and say I was there, that I was with you." Defendant responded by asking, "[W]ould you do that for me?" In two phone calls, defendant talked about his "swerve", which Oglesby knew to reference either "a vehicle" or "the person they might be selling the actual narcotics to as a swerve." In one phone call, defendant said: "[M]y swerve, after the shooting my swerve report got stolen. That's not even the same truck, they don't even know if it's the same truck during the shooting." In the second call, he talked about

how police saw his "message to my swerve about the truck" and he again referenced how "the truck was reported stolen after the shooting."

¶ 22        The State also presented evidence of two jailhouse phone calls between Demarco Jones and Bolden. Jones had been incarcerated in the Sangamon County jail along with defendant in May 2020. Bolden had known Jones for 12 years because Jones had fathered children with Bolden's sister. In a May 5, 2020 phone call, Jones told Bolden he spoke with defendant and defendant's mother would pay Bolden $10,000 if she did not testify or if she claimed she did not see who shot her. Bolden testified she refused the offer.

¶ 23                            F. Guilty Finding and Sentencing

¶ 24        Once the State rested its case-in-chief, the trial court inquired whether defendant wanted to testify. Defendant stated he understood the decision was his, and he decided not to testify. The defense presented no evidence and rested on the State's burden. Following closing arguments and a brief recess, the trial court rendered its finding on the record. The court noted it considered the evidence (both witness testimony and admitted exhibits), determined witness credibility, and allocated appropriate weight to each witness's testimony. Specifically, the court "considered that Markishaa Bolden identified Derrick D. Crawford pursuant to a photogenic [*sic*] lineup conducted by the police department." It further "considered all of the facts and circumstances under which the identification was made including the procedures used by the Springfield Police Department, including all statements made by Officer Jett and the noncompliance with the lineup procedure." The trial then explained how it evaluated Bolden's identification, saying:

> "When weighing all identification testimony, the Court has
>
> considered all of the facts and circumstances in evidence including

- 8 -

but not limited to the following: The opportunity Markishaa Bolden had to view Derrick D. Crawford at the time of the offense. Markishaa Bolden's degree of attention at the time of the offense. Markishaa Bolden's earlier descriptions of Derrick D. Crawford on or after March 28th 2020. The level of certainty shown by Markishaa Bolden when confronting the defendant, Derrick D. Crawford. The court also considered the length of time between the offense and the identification confrontation.

When considering the foregoing, the Court finds Markishaa Bolden's identification of Derrick Crawford credible. The Court has considered all of the testimony of Markishaa Bolden when making this credibility determination including but not limited to the testimony relating to her social medial accounts."

The Court then announced it found defendant guilty on all four counts. It ordered a presentence investigation and set the matter for sentencing.

¶ 25       The parties reconvened for a sentencing hearing on August 11, 2021. The court first took-up other matters, including the parties' agreed order whereby the State moved to dismiss counts III and IV (unlawful possession of a weapon by a felon and possession of a firearm by a street gang member) because defendant had not been properly "admonished of the mandatory nature of [those counts] pursuant to 730 ILCS 5/5-8-4(a)." The trial court accepted the agreement and vacated defendant's convictions on counts III and IV. Next the court addressed defendant's June 2021 motion for a new trial, which alleged several errors, including how trial counsel rendered ineffective assistance by advising defendant to waive his jury-trial right and failing to

move to suppress Bolden's eyewitness identification. The trial court denied defendant's motion, relying on the reasons it gave for the guilty finding. It seemingly agreed with the State's argument that defense counsel's decisions had been strategic, and it moved on to sentencing.

¶ 26    The trial court first engaged defendant in a conversation, inquiring into his readiness to proceed, his mental state, and his opportunity to prepare. This exchange then followed:

> "The Court: I appreciate the argument regarding ineffective assistance of counsel made in the motion for new trial. Outside of that, are you satisfied with the services of Mr. Wykoff that he has performed with respect to preparing for sentencing here today?
>
> [Defendant]: Yeah."

The State then called Justin Spaid, a sergeant with the Springfield Police Department's street crimes unit, who testified to defendant's criminal history and gang affiliation. The State also published videos from defendant's Snapchat account that showed him with known gang members and with firearms. Finally, Spaid testified to increased gang violence in Springfield. In his statement of allocution, defendant maintained his innocence and asked the court for justice. Basing its recommendation on "significant" aggravating factors—like the victims sustaining serious bodily injury, defendant's criminal history, and the need for deterrence—the State recommended a 45-year sentence—15 years for shooting Young and 30 years for shooting Bolden. The State asked the trial court to make a finding that defendant caused serious bodily injury in order to qualify defendant for consecutive sentencing. By contrast, defense counsel recommended a 12-year sentence, noting defendant's troubled upbringing and the remorse he showed during his statement in allocution.

¶ 27    In pronouncing sentence, the trial court noted it "considered the trial evidence, the presentencing investigation report, the history, character, attitude of the defendant, the evidence and arguments, and a thoughtful statement of allocation [sic]," as well as "the statutory matters in aggravation and mitigation." The court found aggravating factors to be the fact there were two small children in Bolden's vehicle and other children in her home, and the fact the shooting occurred "in the middle of the day in a residential neighborhood." The court also found factors in mitigation, including "the defendant's age at the time of the offense and his troubled upbringing." The court further noted "the seriousness of the crimes and the defendant's potential to be rehabilitated given his extensive juvenile history and adult criminal history." The trial court did make a finding of serious bodily injury, noting the sentences would be served consecutively at 85 percent. The trial court sentenced defendant to 15-year terms in DOC for each count followed by 3 years' MSR.

¶ 28    Defendant filed a motion to reconsider the sentence imposed, arguing his 30-year aggregate was unnecessary to restore him to useful citizenship and the trial court placed too much weight on factors in aggravation and too little weight on factors in mitigation. Following a hearing, the trial court denied the motion for reconsideration.

¶ 29    This appealed followed.

¶ 30                                II. ANALYSIS

¶ 31    Defendant challenges his convictions and sentence on three grounds: (1) Bolden's identification lacked credibility and reliability, making the remaining circumstantial evidence insufficient to prove him guilty beyond a reasonable doubt, (2) his 30-year sentence should be vacated and the cause remanded for resentencing because the trial court and the parties erroneously believed defendant to be eligible for extended-term sentencing, and (3) the trial court failed to

conduct a *Krankel* inquiry into defendant's ineffective-assistance-of-counsel claim. We disagree and affirm the trial court's judgment.

¶ 32                                    A. Sufficiency of the Evidence

¶ 33            "The due process clause of the fourteenth amendment to the United States Constitution requires that a person may not be convicted in state court 'except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.' " *People v. Cunningham*, 212 Ill. 2d 274, 278, 818 N.E.2d 304, 307 (2004) (quoting *In re Winship*, 397 U.S. 358, 364 (1970)). When a defendant appeals his convictions, arguing the State failed to satisfy this burden of proof, a reviewing court will not retry the defendant but asks " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *Cunningham*, 212 Ill. 2d at 278 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

¶ 34            An essential element in any crime is identity, the "whodunnit", as it were. Thus, the State bears "the burden of proving beyond reasonable doubt the identity of the person who committed the crime." *People v. Slim*, 127 Ill. 2d 302, 307, 537 N.E.2d 317, 319 (1989). Testimony from one credible eyewitness can provide proof beyond a reasonable doubt to establish identity and sustain a conviction. *Slim*, 127 Ill. 2d at 307; see *People v. Smith*, 185 Ill. 2d 532, 541, 708 N.E.2d 365, 369 (1999). When evaluating an eyewitness's identification, the factfinder should consider the circumstances surrounding both the crime and the identification process, including the well-known factors from *Neil v. Biggers*, 409 U.S. 188 (1972), namely:

> "(1) the witness's opportunity to view the criminal at the time of the crime; (2) the witness's
>
> degree of attention; (3) the accuracy of the witness's prior description of the criminal;
>
> (4) the witness's level of certainty at the identification confrontation; and (5) the length of

time between the crime and the identification confrontation." *People v. Standley*, 364 Ill. App. 3d 1008, 1014, 848 N.E.2d 195, 200 (2006) (citing *Slim*, 127 Ill. 2d at 307-08).

Considering these factors, a conviction can be sustained as long as the single witness viewed the accused under circumstances permitting a positive identification. *People v. Lewis*, 165 Ill. 2d 305, 356, 651 N.E.2d 72, 96 (1995). Any inconsistencies between the witness's pretrial identification and testimony or in the witness's description of the accused do not automatically raise reasonable doubt when the witness has made a positive identification. *Slim*, 127 Ill. 2d at 309. Instead, such inconsistencies "raise questions of credibility" for the factfinder to resolve when determining the verdict. *Slim*, 127 Ill. 2d at 308. We defer to the factfinder's credibility determinations. See *Smith*, 185 Ill. 2d at 542.

¶ 35       This case hinged on identity in the trial court—with the State arguing the evidence confirmed defendant was one of the men who shot Young and Bolden and the defense arguing the defendant was not at the scene because no physical evidence placed him there. On appeal, identity remains the central issue. Defendant attacks the sufficiency of the evidence, premising his argument on the view that Bolden's identification of him was unreliable and incredible and the trial court should have rejected it. Without the identification evidence, defendant concludes, the State's case proved insufficient. We disagree with defendant's premise and conclusion—Bolden's identification was both reliable and credible, and the evidence sufficiently proved defendant's guilt beyond a reasonable doubt.

¶ 36       The trial court found Bolden's identification of defendant credible. After commenting on the factors, the court considered in assessing the testimony of each witness, and in making credibility determinations for each of them, the trial court then expressly referenced the *Biggers* factors listed in *Standley* and found Bolden's identification credible.

¶ 37 The evidence established Bolden had an opportunity to view the shooter during the crime. Indeed, immediately following the shooting, she told both the 911-operator and the officer who approached her vehicle that she saw the shooter. When recounting the shooting, she testified she looked to her left, out of the driver's side window, and saw the two shooters, one standing closer to her vehicle and looking directly at her as he fired. She even recalled how the shooters held their guns. As for her degree of attention, Bolden testified she could not move once the shooting began because she was wearing her seatbelt and had been hit. She explained she could only sit there and wait, and she said, "I was looking at him wondering when he was going to stop." Since Bolden could do nothing but look at her attacker, she not only had an opportunity to see the shooter, but she maintained a high degree of attention.

¶ 38 Bolden gave a description of the shooter before she actually identified him in the photo array. She told detectives Oglesby and Overby the shooter was a young black male, caramel-complected, who stood about 5'9 to 5'10 tall, wearing dark clothing. When she viewed the photo array, Bolden focused on defendant's eyes, noting they were distinctive. The record confirms defendant was 20-years-old on March 28, 2020—"young" by any standard. As for the accuracy of Bolden's description of defendant's eyes, complexion, and height, the trial court had the firsthand opportunity to compare Bolden's description of defendant's features and person to his real-life appearance. Further the trial court had the advantage of assessing the degree of certainty Bolden exhibited when identifying defendant at trial, and throughout extensive cross-examination on the issue. Turning to Bolden's level of certainty when identifying defendant in the photo array, we note she took little time (less than 30 seconds out of the six minutes it took to conduct the array) to identify defendant as the shooter. She told Officer Jett, "I believe that's who it is", noting almost immediately that she recognized defendant's eyes. Defendant properly

points to Bolden's use of "believe" to undermine her certainty, but we will not parse her choice of words on this cold record. Seeking to further weaken Bolden's certainty, defendant points to Bolden's question before she identified defendant from the one-page photo array, asking Jett, "Is this all you have?" Again, we will not read uncertainty into such a question. She asked the question only 13 seconds after receiving the one-page photo lineup. The trial court heard these same things and—having observed her testify, while taking all relevant factors into consideration—concluded she was a credible witness. Finally, we note little time elapsed between the crime and the identification confrontation. Bolden identified defendant just one day after the shooting. Viewing the facts and circumstances of this case through *Standley*'s five-factor lens, we see no error in the trial court considering and crediting Bolden's identification of defendant.

¶ 39    Defendant attacks the reliability of Bolden's identification by isolating and emphasizing Officer Jett's comment "*so the suspect I assume \*\*\* is on those*," and then suggesting the comment tainted the entire identification confrontation because defendant's picture was the only one Bolden recognized. (Emphasis added.) Of course, Jett's off-scripted comment was thoughtless and unnecessary. But, when taken in context, the comment did not render Bolden's identification of defendant unreliable. Jett made the statement when explaining he was not associated with the investigation, trying to relay to Bolden he did not know who the suspect was. Furthermore, the comment came sandwiched between Jett telling Bolden repeatedly the suspect may or may not be in the lineup. He also told Bolden it was important to exclude people as suspects as well. In total, Jett told Bolden three times that the suspect may not be in the photo array. Nevertheless, Jett's comment did not go unnoticed by the trial court, which, when announcing the verdict, stated it considered the facts and circumstances of the identification, including the police department procedures along with "all statements made by Officer Jett and the noncompliance

with the lineup procedure." The record, therefore, shows the trial court gave due deliberation to all of the identification evidence and found it reliable and credible. We defer to these determinations, since weighing evidence and judging witness credibility lies within the factfinder's purview as it hears the evidence firsthand and watches the witness testify. See *Best v. Best*, 223 Ill. 2d 342, 350-51, 860 N.E.2d 240, 245 (2006). More importantly, though, we will not disturb the trial court's assessment of the identification evidence because a factfinder "could reasonably accept the testimony as true beyond a reasonable doubt." *Cunningham*, 212 Ill. 2d at 279.

¶ 40 The analysis, however, must continue, since defendant also argued the entirety of the State's evidence failed to prove him guilty beyond a reasonable doubt. We observe the identification evidence comprised only part of the State's case. The State presented other evidence tying defendant to the March 28, 2020, shooting. Several eyewitnesses reported seeing the two shooters flee in a silver vehicle. David Tarr, who lived in a nearby first-floor apartment, gave the most specific description of the vehicle. He testified he went outside when he heard the gunshots (which he believed were firecrackers) and saw a gray SUV leaving. He recognized the SUV as a GMC Acadia. Other evidence revealed the police recovered a silver GMC Acadia belonging to Tracy Potter later on March 28, after the shooting. The State presented surveillance footage from Spring Meadow Apartments showing Potter's Acadia pulling into the parking lot and parking. The video then shows three young men emerging from the vehicle, getting into another car, and leaving.

¶ 41 Cellphone evidence showed defendant's iPhone in contact with Potter's phone, texting about trading her vehicle for drugs. Moreover, location data from defendant's iPhone showed he was within a half-mile from Potter's home at 4:38 a.m. on March 28. Potter testified that, in the early hours of March 28, two young African American males entered her apartment to

exchange drugs for the keys to her Acadia. She recalled both men had gold in their teeth. The State later presented videos from defendant's social media accounts where gold was visible in his teeth.

¶ 42　　　　Finally, the State played defendant's jailhouse phone calls, in which he made statements which, at worst, were inculpatory and, at best, indicated consciousness of guilt. He tried to learn who among his cohorts was talking to police. He complained about certain individuals identifying him as the person who shot Bolden and Young. He asked his mother to scrub information from his phone and social media accounts. He asked a woman if she would be willing to provide alibi evidence for him. He twice referenced a "swerve," which could refer to either a vehicle or a person with whom he trades drugs for vehicles and noted his "swerve" had been reported stolen—just as Potter's vehicle had been reported stolen. The State also presented evidence of a phone call between Demarco Jones and Bolden, in which Jones relayed an offer from defendant's mother to pay Bolden $10,000 to either not testify or say she didn't see the shooter. All this evidence was admitted and considered by the trial court. Defendant rightly deems this evidence circumstantial. But he seemingly forgets that "[c]ircumstantial evidence alone is sufficient to sustain a conviction where it satisfies proof beyond a reasonable doubt of the elements of the crime charged." (Internal quotation marks omitted.) *People v. Day*, 2019 IL App (4th) 160217-B, ¶ 47, 147 N.E.3d 195.

¶ 43　　　　Viewing all the evidence in the light most favorable to the State and deferring to the trial court's credibility determinations, we hold the evidence reasonably supports findings of guilt beyond a reasonable doubt for the offenses of aggravated battery with a firearm. See *Cunningham*, 212 Ill. 2d at 278. Based on the above evidence, a rational fact finder could have found the State proved beyond a reasonable doubt all essential elements of the charged crimes—including identity. See *Smith*, 185 Ill. 2d at 541.

¶ 44                           B. Extended-Term Sentencing

¶ 45        Defendant next attacks his sentence, arguing it should be vacated because the
parties and the trial court erroneously believed defendant was eligible for extended term
sentencing.

¶ 46        Notably, defendant did not object the two times extended-term sentencing was
discussed and determined to apply to him in the trial court. Nor did he raise this particular issue in
his posttrial motion to reconsider the sentence. Defendant, therefore, waived this issue and can
only obtain review and relief if he establishes plain error. Under the plain-error doctrine, this court
may recognize and review clear errors in two scenarios: "(1) when the evidence is closely balanced
or (2) when an error is so fundamental a defendant may have been denied a fair sentencing
hearing." *People v. Hausman*, 287 Ill. App. 3d 1069, 1071, 679 N.E.2d 867, 869 (1997). A fair
sentencing hearing necessarily requires "a trial judge who knows the minimum and maximum
sentences for the offense." *Hausman*, 287 Ill. App. 3d at 1071-72. Accordingly, this court
previously held "[a] misunderstanding as alleged here"—where the trial court mistakenly
determined extended-term sentencing applied—"falls within the second prong of the plain error
rule." *Hausman*, 287 Ill. App. 3d at 1072.

¶ 47        When it comes to extended-term sentencing under the Code, the prevailing
principle is that a defendant only becomes eligible for an extended-term sentence when (among
other requirements) he has previously committed a felony in the "same or similar *** or greater
class." 730 ILCS 5/5-5-3.2(b)(1) (West 2020). For example, a defendant convicted of a Class X
felony should only become extended-term eligible based on a prior Class X felony conviction. See
730 ILCS 5/5-5-3.2(b)(1) (West 2020). Defendant's argument centers upon subsection 3.2(b)(7)
(730 ILCS 5/5-5-3.2(b)(7) (West 2020)) of the Code, which was applied to him and lacks the

"same or similar class felony or greater class felony" provision found in subsection 3.2(b)(1) (730 ILCS 5/5-5-3.2(b)(1) (West 2020)). Rather, it provides:

> "(b) The following factors, related to all felonies, may be considered by the court as reasons to impose an extended term sentence under Section 5-8-2 upon any offender:

> * * *

> (7) When a defendant who was at least 17 years of age at the time of the commission of the offense is convicted of a felony and has been previously adjudicated a delinquent minor under the Juvenile Court Act of 1987 for an act that if committed by an adult would be a Class X or Class 1 felony when the conviction has occurred within 10 years after the previous adjudication, excluding time spent in custody[.]" 730 ILCS 5/5-5-3.2(b)(7) (West 2020).

The omission of the same-similar-or-greater clause results in a specific, rare, and potentially unconstitutional anomaly, where an adult convicted of a Class X felony would be eligible for extended-term sentencing based on a prior Class 1 felony juvenile adjudication, but he (or a similarly situated defendant) would not be extended-term eligible had he committed the prior Class 1 felony as an adult. This disparate treatment invites constitutional challenges like defendant levies here.

¶ 48          The First District addressed this exact issue in *People v. Johnson*, 2013 IL App (1st) 120413, 994 N.E.2d 1086, where the adult defendant was convicted of a Class X felony and was considered extended-term eligible based on a prior Class 1 felony delinquency adjudication. The *Johnson* court found subsection 3.2(b)(7), on its face, "appears to pose a problem under the equal protection clauses of both the United States and the Illinois Constitutions." *Johnson*, 2013 IL App

(1st) 120413, ¶ 15. Mindful of the doctrine of constitutional avoidance, the First District determined, "[i]t is possible to interpret section 5-5-3.2(b)(7) to avoid declaring it unconstitutional as applied." *Johnson*, 2013 IL App (1st) 120413, ¶ 16. After comparing sections 5-5-3.2(b)(1) and (b)(7), applying statutory-interpretation principles, and giving due consideration to legislative intent, the court held "that the omission of the language 'same or similar class felony or greater class felony' was inadvertent and should be read into section 5-5-3.2(b)(7)." *Johnson*, 2013 IL App (1st) 120413, ¶ 21. Subsequently, it determined Johnson was not extended-term eligible. *Johnson*, 2013 IL App (1st) 120413, ¶ 21. Defendant argues subsection 3.2(b)(7) should either be similarly interpreted here and exclude him from extended term sentencing (as in *Johnson*), or it should be found unconstitutional and inapplicable—either way, defendant seeks remand for resentencing.

¶ 49       The State "agrees that this court should interpret 730 ILCS 5/5-5-3.2(b)(7) to include the same-or-greater-class-felony rule of subsection (b)(1)" because "[d]efendant here falls into the same rare situation as [the] defendant in *People v. Johnson*, 2013 IL App (1st) 120413 and this Court should rely on that case in interpreting 730 5/5-5-3.2(b)(7)." But the State disagrees with defendant's contention that the matter must be remanded for resentencing.

¶ 50       We agree *Johnson* controls here, and we read subsection 3.2(b)(7) to include the same-similar-or-greater-class-felony language found in subsection 3.2(b)(1). Consequently, we conclude defendant was not extended-term eligible on his Class X felony convictions for aggravated battery with a firearm. We must next consider whether his 30-year sentence must be vacated, and the matter remanded for resentencing.

¶ 51       Decades-old supreme court precedent from *People v. Eddington*, 77 Ill. 2d 41, 394 N.E.2d 1185 (1979), holds that when a trial court misunderstands and misstates the minimum

- 20 -

sentence a new sentencing hearing is necessary " 'only when it appears that the mistaken belief of the judge *arguably* influenced the sentencing decision.' " (Emphasis in original.) *Hausman*, 287 Ill. App. 3d at 1072 (quoting *Eddington*, 77 Ill. 2d at 48). We have applied *Eddington*'s standard when the trial court misstated the entire sentencing range under the mistaken belief defendant was eligible for extended-term sentencing. *People v. Hill*, 294 Ill. App. 3d 962, 970, 691 N.E.2d 797, 803 (1998); accord *People v. Quinones*, 362 Ill. App. 3d 385, 398, 839 N.E.2d 583, 593 (2005) (citing *Hausman*, 287 Ill. App. 3d at 1072). When applying *Eddington* and considering whether a mistaken belief arguably influenced the trial court's sentencing decision, we pay particular attention to the trial court's comments during the sentencing hearing. What the court said will likely indicate if it relied upon, or even used as a referenced point, its mistaken belief that defendant was extended-term eligible. *Hill*, 294 Ill. App. 3d at 970.

¶ 52        Without extended-term sentencing, defendant faced a sentencing range of 6 to 30 years for each Class X felony. With extended-term sentencing, the sentencing range increased to 6 to 60 years. No matter if extended-term sentencing applied, defendant's sentences had to be served consecutively because the trial court made the requisite finding that defendant caused serious bodily injury to Young and Bolden.

¶ 53        The record before us shows neither the parties nor the trial court mentioned defendant's extended-term eligibility during the sentencing hearing. The State did not recommend an extended-term sentence. It asked the court to impose a 45-year sentence—15 years for shooting Young and 30 years for shooting Bolden. Each recommended sentence fell within the normal sentencing range. Defense counsel requested a 12-year sentence—6-year minimums for each count. Most importantly, though, the trial court did not reference extended-term sentencing when rendering the 30-year sentence—15 years for each count. The trial court imposed sentences at the

lower end of the normal (nonextended) sentencing range, which comports with its comments during sentencing. It made two findings in aggravation (children being in the car and the crime occurring midday in a residential neighborhood) and two findings in mitigation (defendant's age and upbringing). While the trial court also noted the seriousness of the crime and defendant's criminal history, it also referenced his "thoughtful statement of allocution" and his potential for rehabilitation. It appears the good and bad factors offset each other, and the trial court fashioned a sentence mid-range between the minimum and maximum sentence possible. This is especially true considering defendant's criminal history, including multiple gun-related offenses and crimes of violence. Based on this record, it is clear the trial court neither relied upon nor even used as a reference point defendant's eligibility for extended-term sentencing. See *Hill*, 294 Ill. App. 3d at 970. We, therefore, cannot conclude the trial court's mistaken belief that defendant was extended-term eligible even *arguably* influenced its sentencing decision. See *Quinones*, 362 Ill. App. 3d at 398.

¶ 54    In urging for vacatur and remand for resentencing, defendant directs our attention to *People v. Myrieckes*, 315 Ill. App. 3d 478, 734 N.E.2d 188 (2000), and *People v. Hurley*, 277 Ill. App. 3d 684, 661 N.E.2d 460 (1996), likening his case to those. However, we find those cases distinguishable and inapplicable here.

¶ 55    In the *Myrieckes* sentencing hearing, the trial court "did not indicate the sentencing range or whether [it] believed defendant was eligible for an extended-term," but the State and defense counsel referenced defendant's extended-term eligibility when recommending sentences to the court. *Myrieckes*, 315 Ill. App. 3d at 484. The Third District vacated the defendant's sentence and remanded "[b]ecause the record suggest[ed] that the trial court erroneously believed that defendant was eligible for extended-term sentencing." *Myrieckes*, 315 Ill. App. 3d at 484. As we

- 22 -

described above, there is no such suggestion in this record. Neither party referenced extended-term eligibility when recommending sentences.

¶ 56　　　　　In *Hurley*, unlike here, the State recommended a sentence in the extended range. *Hurley*, 277 Ill. App. 3d at 685-86. Moreover, unlike this trial court, the *Hurley* court commented during the sentencing hearing how defendant was extended-term eligible, even interrupting defense counsel to make the point. *Hurley*, 277 Ill. App. 3d at 686. And later, when denying defendant's motion to reconsider the sentence, the trial court again referenced how defendant's prior conviction " 'could really accelerate his sentence or something that I could consider anyway.' " *Hurley*, 277 Ill. App. 3d 687. On appeal, the Second District found "the trial court's comments during the sentence hearing and during the hearing on defendant's motion to reconsider indicate that the court considered defendant's eligibility for an extended-term sentence as a reference point in deciding what sentence to impose." *Hurley*, 277 Ill. App. 3d at 687. The court vacated the sentence and remanded for resentencing, holding "the trial court's mistaken belief that defendant was eligible for an extended-term sentence *arguably* influenced the court's sentencing decision." (Emphasis added.) *Hurley*, 277 Ill. App. 3d at 687. Since *Hurley*'s facts drastically differ from those before us, we find it distinguishable and decline to follow it.

¶ 57　　　　　　　　　　　　　C. *Krankel* Inquiry

¶ 58　　　　　Finally, defendant argues the trial court erred in not inquiring into his ineffective-assistance-of-counsel claim pursuant to *Krankel*, 102 Ill. 2d 181. We disagree.

¶ 59　　　　　"When a criminal defendant believes that he has not received effective assistance of counsel at his trial and he so notifies the court, the court *must* inquire into his claim." (Emphasis added.) *People v. Bates*, 2019 IL 124143, ¶ 15, 158 N.E.3d 211 (citing *Krankel*, 102 Ill. 2d at 189). Defendant's means of notifying the court need not be formal. He may allege trial counsel's

ineffectiveness in either oral or written form, just so long as it brings the issue to the trial court's attention. *Bates*, 2019 IL 124143, ¶ 15. Likewise, the defendant need not provide an exhaustive factual basis for his ineffective-assistance-of-counsel allegation and can merely use the words "ineffective assistance of counsel." *Bates*, 2019 IL 124143, ¶ 15. These relaxed parameters notwithstanding, to sufficiently raise a claim of ineffective assistance of trial counsel meriting a *Krankel* inquiry, a defendant must raise the issue himself and must raise it clearly with the court. *Bates*, 2019 IL 124143, ¶¶ 15, 36.

¶ 60 Taking *Bates*'s lenient standards to the extreme, defendant asserts he clearly indicated to the court that he believed his trial counsel proved ineffective and, therefore, the trial court should have inquired into his claim pursuant to *Krankel*. Defendant's argument relies upon obviously distinguishable precedent and, more concerning, displays a total disregard for reading the record contextually.

¶ 61 Defendant's trial counsel filed a motion for new trial on June 24, 2021, where he alleged his own ineffectiveness for failing to move to suppress Bolden's identification of defendant and for advising defendant to waive his jury-trial right and proceed to a bench trial. The trial court took up the motion in the August 11, 2021, sentencing hearing. Defense counsel argued his motion, including his own ineffectiveness, and the trial court denied it. In then proceeding to sentencing, the trial court inquired into defendant's readiness for sentencing, asking if there was anything impairing his understanding of the proceedings. Defendant answered no. The court then asked:

> "The Court: I appreciate the argument regarding ineffective assistance of counsel made in the motion for new trial. Outside of that, are you satisfied with the services of Mr. Wykoff that he has performed with respect to preparing for sentencing here today?

[Defendant]: Yeah."

Defendant bases his argument on appeal on the court saying, "Outside of that." Defendant reasons that since the court couched its question with "Outside of that," defendant's response that he was satisfied with his trial counsel was actually a clear assertion of ineffective assistance of counsel. We find this interpretation incredible. It belies common sense and context. The trial court was asking defendant about his satisfaction with trial counsel's preparedness for sentencing. We cannot interpret defendant's "yeah" response as an allegation of ineffective assistance of counsel. Defendant himself did not clearly bring an ineffective-assistance-of-counsel claim to the trial court's attention. Even during the court's detailed inquiry into his understanding of the proceedings, his mental state, and his preparedness for the sentencing hearing itself, defendant made no further comment about counsel. His attorney sought to raise his own ineffectiveness, and the trial court rejected it. There was no obligation for the trial court to conduct a *Krankel* inquiry.

¶ 62　　　　　Defendant, nevertheless, cites *People v. Willis*, 2013 IL App (1st) 110233, 997 N.E.2d 947, as authority for requiring a *Krankel* inquiry even when it is trial counsel, and not the defendant, who raises the ineffective-assistance-of-counsel issue. There, a juvenile defendant was convicted of murder, and trial counsel raised his own ineffectiveness in a posttrial motion for a new trial. *Willis*, 2013 IL App (1st) 110233, ¶ 62. When the State pointed out that a defense attorney arguing his own ineffectiveness created a conflict of interest, defense counsel struck the ineffective-assistance-of-counsel paragraph from the motion and did not argue it. *Willis*, 2013 IL App (1st) 110233, ¶ 62. The defendant never raised a claim of ineffectiveness, and the trial court never inquired into counsel's effectiveness. *Willis*, 2013 IL App (1st) 110233, ¶ 62. The First District remanded for a *Krankel* inquiry, finding "[t]he underlying facts *** unusual." *Willis*, 2013 IL App (1st) 110233, ¶ 69. Indeed, the court highlighted how Willis's counsel first alleged his own

ineffectiveness and then withdrew the allegation. It also noted the defendant's young age "and what that implies." *Willis*, 2013 IL App (1st) 110233, ¶ 69.

¶ 63    Aside from sharing one similar fact—defense counsel alleging his own ineffectiveness in a motion for a new trial—this case does not compare to *Willis*. Here, defense counsel did not withdraw his ineffective-assistance allegation and actually argued his own ineffectiveness to the trial court. The trial court rejected this argument outright. Furthermore, this case does not involve a juvenile defendant. Our supreme court has limited *Willis* to its "unusual" facts. *Bates*, 2019 IL 124143, ¶ 29. Indeed, when considering similar arguments as those from this case and *Willis*, the *Bates* court held "that a claim of ineffective assistance of counsel *must* come from the defendant himself." (Emphasis added.) *Bates*, 2019 IL 124143, ¶ 36. The court provided one exception, noting: "An attorney may raise a claim of his own ineffectiveness only if he does so clearly and at the defendant's direction and informs the court that the defendant has instructed him to make such a claim." *Bates*, 2019 IL 124143, ¶ 36.

¶ 64    Defendant acknowledges that trial counsel raised his own ineffectiveness as part of a motion for new trial, yet he tries to squeeze his situation into the *Willis* mold. It doesn't fit. Nor does it fit within the *Bates* exception. There is no indication defense counsel raised his own ineffectiveness on defendant's instruction. In fact, he raised it in spite of a careful record made at the outset of trial where he expressed confidence in his strategy to proceed as he did. Accordingly, *Bates*'s rule that a defendant must raise a claim of ineffective assistance of counsel himself controls. The trial court did not error in not conducting a *Krankel* inquiry.

¶ 65                                    III. CONCLUSION

¶ 66    For the reasons stated, we affirm the trial court's judgment.

¶ 67    Affirmed.

*People v. Crawford*, 2023 IL App (4th) 210503

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Sangamon County, No. 20-CF-391; the Hon. Jennifer Ascher, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Catherine K. Hart, and Gregory G. Peterson, of State Appellate Defender's Office, of Springfield, for appellant. |
| **Attorneys for Appellee:** | Daniel K. Wright, State's Attorney, of Springfield (Patrick Delfino, David J. Robinson, and Courtney M. O'Connor, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |